[No. A091586. First Dist., Div. Four. Mar. 4, 2002.]

THE PEOPLE, Plaintiff and Respondent, v.
MATTHEW MARK KOZLOWSKI et al., Defendants and Appellants.

**[Opinion certified for partial publication.\*]**

\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts III. through V.

## COUNSEL

Joseph Shipp, under appointment by the Court of Appeal, for Defendant and Appellant Matthew Mark Kozlowski.

Kathy M. Chavez, under appointment by the Court of Appeal, for Defendant and Appellant Donald Paul Gatson.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Catherine A. Rivlin and Michael E. Banister, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**REARDON, J.**—A jury convicted appellants Matthew Mark Kozlowski and Donald Paul Gatson of two counts each of robbery, attempted murder, and kidnapping for purposes of extortion, as well as a single count of carjacking. It found various arming and great bodily injury enhancement allegations to be true and Gatson was found to have suffered two prior convictions. (See Pen. Code,[1] §§ 187, 211, 215, 664, 667, subd. (a); see former §§ 209, subd. (a), 667.5, subd. (b), 12022, subd. (b), 12022.7, subd. (a).)[2] Each was sentenced to four consecutive life terms—two without possibility of parole and two with possibility of parole. Restitution and parole revocation fines were also levied. (See § 1202.45; see former § 1202.4, subd. (b).)[3] On appeal, Kozlowski and Gatson[4] argue that (1) they were unlawfully convicted of kidnapping for extortion because a personal identification number (PIN) code is not property that may be extorted; (2) insufficient evidence supports the verdicts of kidnapping for extortion and attempted murder; (3) the kidnapping for extortion statute is unconstitutionally vague as applied; and (4) the trial court committed various instructional errors. They also challenge their sentences, raising claims of (5) disparate sentencing; (6) failure to allege a key fact in the information; and (7) illegal or excessive fines. We agree that the fines imposed must be modified, but otherwise affirm the judgments.

## I. FACTS

### A. *The Crime*

On July 4, 1999,[5] 15-year-old Lisa C. spent the day in Fremont at the home of her friend Reann V. About 11:00 p.m., another of Lisa's friends—18-year-old Robyn C.—joined them. Lisa had invited Robyn to come over

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

[2] The versions of these provisions in effect on the date of the crime have been amended since that time. However, none of these amendments make any substantive changes to the cited statutes, to the extent relevant to the case before us. (See former § 209, subd. (a), as amended by Stats. 1997, ch. 817, § 2, last amended by Stats. 2000, ch. 287, § 3; former § 667.5, subd. (b), as amended by Stats. 1997, ch. 371, § 2, last amended by initiative in Prop. 21 [approved by voters Mar. 7, 2000]; former § 12022, subd. (b), as amended by Stats. 1995, ch. 377, § 8, last amended by Stats. 1999, ch. 129, § 4; former § 12022.7, subd. (a), as amended by Stats. 1995, ch. 341, § 1, last amended by Stats. 2000, ch. 919, § 1.)

[3] The version of this statute in effect on the date of the crime has been amended since that time. However, the amendments make no substantive change to the cited statute, to the extent relevant to the case before us. (See former § 1202.4, subd. (b), as amended by Stats. 1998, ch. 587, § 5.5, last amended by Stats. 2000, ch. 1016, § 9.5.)

[4] Each appellant joins in the arguments raised by the other, to the extent that they are applicable. (See Cal. Rules of Court, rule 13.)

[5] All dates refer to the 1999 calendar year unless otherwise indicated.

because she had a car and Lisa wanted to get some methamphetamine. They called Holly F., whose ex-boyfriend Anthony Kozlowski supposedly had access to drugs. Lisa, Robyn, and Reann and a fourth girl, Natasha O., drove to meet Holly and Anthony. Anthony got into the car and the four girls drove with him to a large apartment complex where Anthony's brother Matthew was thought to have some methamphetamine.

Anthony left the four girls waiting in the car. Five minutes later, he returned with his brother, appellant Matthew Mark Kozlowski.[6] Apparently, Kozlowski did not have any methamphetamine because Anthony and the four girls made several other attempts to locate methamphetamine from other potential sources, all without success. The four girls left Anthony and drove back to the apartment house where Kozlowski and another man—later identified as appellant Donald Paul Gatson—stood outside. Kozlowski told the girls to come back in an hour. Lisa gave Kozlowski her pager number.

The girls went to a birthday party at a hotel in the early morning hours on July 5. At the hotel, Lisa was paged. She received a message from Kozlowski asking only two of the girls to meet him at the apartment. Lisa and Robyn dropped off Reann and Natasha, then drove back to the apartment where Kozlowski waited. He got into Robyn's car and they picked up Gatson. Judging by the way he was acting, Lisa thought Kozlowski might have been under the influence of something, but she was not certain. The two men sat in the backseat, Gatson behind Lisa and Kozlowski behind Robyn, who was driving. One of the men directed Robyn to drive to a nearby school where they were to meet someone with methamphetamine. After waiting about 10 minutes without meeting anyone, they all returned to the apartment complex.

When Lisa got out of the car, Gatson put a gun to her head and told her to get in the backseat. She did as she was told. Kozlowski placed a knife against Robyn's back and told her to get back into the car, too. She followed Lisa into the backseat. Kozlowski tried to start the car, but was not able to get it in gear. After a few minutes, he let Robyn drive. Kozlowski got into the backseat beside Lisa. Gatson put his arm around Robyn and told her "You're a very beautiful girl. You're going to be my girlfriend for the night." Kozlowski said, "No, we're not like that." Gatson was angry when he heard Kozlowski say that. Gatson told Robyn, "You can't run from a bullet. You know that, right?"

Gatson told Robyn to drive toward a 7-Eleven store. In the backseat, Kozlowski began looking through Lisa's purse. He took some change and an

---

[6]To avoid confusion, the opinion refers to Anthony Kozlowski by his given name and refers to appellant Matthew Kozlowski by his surname.

ATM[7] card. Kozlowski asked for Lisa's PIN code. She did not want to reveal this but she was in a dangerous position, so she did. During the drive, Gatson handed Kozlowski a roll of tape and instructed him to tie Lisa's hands. Kozlowski did so. Then, he asked Lisa if she had anything on her. When she replied that she had $20 in her shirt pocket, he took the money and a pocket knife that she also had.

At the 7-Eleven store, Kozlowski got out of the car. Gatson remained, pointing his gun at Robyn. Robyn began crying and pleaded with Gatson to let them go. He said for them not to worry. "[W]e're not going to do anything to you guys. We'll probably just take you up a road and slit your tires so you . . . can't go to the cops right away."

Kozlowski came back to the car with cigarettes and a six-pack of Coke. He got into the backseat behind Robyn again. He indicated that he had tried to use Lisa's ATM card but that there was no money in it. Gatson told Robyn to keep driving. Kozlowski found Robyn's purse and produced her ATM card. When asked for her PIN, she revealed it because one man held a gun and the other had a knife. On command, Robyn drove to another 7-Eleven store, where Kozlowski again left the other three in the car. Robyn was in tears, begging Gatson to let them go. Gatson was angry with her for crying, telling her "Stop crying, you fucking bitch." Lisa later recalled that Gatson said, "If a cop comes to the window, lean back so that I can have a good shot at him."

Kozlowski returned, indicating that he had obtained $200. He said that it was too bad that they had not picked up Lisa and Robyn before midnight, because they could have gotten $200 before midnight and another $200 after. Lisa complained that the tape was cutting off the circulation in her hands. Gatson instructed Kozlowski to loosen Lisa's hands. Kozlowski pulled out a folding knife that had a blade from four to six inches long, cut the tape off and told Lisa to remove the old tape so he could retape her hands. He taped them looser this time.

Robyn was instructed to drive to Palomares Road. She did as she was told. During the drive, she asked Gatson to let them go. He said that the "last girl that said that to me was sitting up on the stand pointing her finger at me." That comment scared Lisa. Twice, Gatson instructed Robyn to pull over and let cars pass her.

About 2:30 or 3:00 a.m., Gatson instructed Robyn to turn around and stop the car next to a ditch. Kozlowski told Robyn to get out of the car. As she

---

[7]An ATM is an automatic teller machine. (See *People v. Butler* (1996) 43 Cal.App.4th 1224, 1236 [51 Cal.Rptr.2d 150].)

stood next to her car, Kozlowski got out and stabbed Robyn in the chest near her heart. Then, he stabbed Robyn's arm. Lisa saw that it was slit open; there was blood all over. Kozlowski pushed Robyn back into the backseat of her car. He yelled that she was bleeding all over the car; Gatson said, "Shut the fuck up, bitch." Gatson tried to stab her legs, but she blocked him with her foot.

Gatson pointed the gun at Lisa and fired, but he missed. Lisa recalled that he laughed and said, "It scared you, huh?" Robyn remembered him saying "You're lucky, bitch. I missed you that time." He then shot Lisa in the face and the chest, screaming "Did you like that?" Robyn heard him say, "I didn't miss that time."

Gatson got out of the car. He told Lisa to get out, but her hands had been taped over her seat belt. He tried to pull her out, then tried without success to cut the seat belt with the knife Kozlowski had used earlier. He cut the tape on her hands and took the seat belt off instead, then pulled her out of the car. Lisa blanked out for a moment, falling to the ground and then regaining consciousness. As she lay on the ground, Gatson stabbed her as many as 15 times before he stopped.

Gatson pulled Robyn out of the car and threw her on the ground a few feet from Lisa. He stabbed and kicked and punched her repeatedly. She heard Kozlowski say "Make sure they're dead." Gatson returned to Robyn and attempted to slit her throat, but cut her chin instead. She cried out to make it sound like he had slit her throat. Robyn saw Gatson approach Lisa and then heard more stabbing sounds. One of the two men—Lisa was not sure which one—stabbed her eight more times. She was certain that she was going to die. Then, the two men got into the car—Kozlowski in the driver's seat— and she heard the car drive off.

Both girls were conscious. Robyn rolled over close to Lisa and called out to learn if her friend was still alive. It hurt for Lisa to speak but she let Robyn know that she was not dead. The girls were side by side in a drainage ditch, able to touch each other. Both were bleeding from their wounds. The girls spoke with each other, amazed that they were alive, shivering from the cold. When they tried to move or call for help, the effort made them feel that their wounds were bleeding even more profusely.

About 6:00 a.m., it began to get light and people began driving by. Lisa threw sticks at the cars, hoping to attract attention. About 7:00 a.m., two bicyclists riding on Palomares Road in an unincorporated part of Alameda County heard a faint cry for help. One went off to call 911, the other stayed

with the girls. He gave them water and gave Robyn his jacket. A priest from a nearby monastery came and prayed with them. A woman who lived down the street came with a blanket to keep them warm until an ambulance arrived to take Lisa and Robyn to the hospital.

In addition to suffering several gunshot wounds, Lisa had 23 stab wounds on her body—some on her torso, many on her arms and legs. She spent nearly two weeks in a hospital. She suffered a collapsed lung and a broken arm. She underwent surgery to remove blood from her lungs. She was told that she was lucky to be alive. Her body was riddled with scars—some still hurt six months later and some parts of her body were numb. Robyn suffered 15 stab wounds to her chest, abdomen and extremities. Her spleen and liver had been injured in the attack. She required surgery to save and mend these organs. Six months later, her body was still scarred.

B. *Investigation*

Alameda County deputy sheriffs arrived at Palomares Road about 7:00 a.m. Lisa and Robyn were bloody but somewhat conscious and coherent. One officer learned the names of the suspects and that Robyn's car had been taken. After learning that the girls had been kidnapped in Fremont, officers from that jurisdiction were summoned and soon took over the investigation.

Holly, Reann and Natasha were all interviewed by police, who learned the identities of the two suspects. Anthony was also interviewed. Fremont police found Robyn's car within two blocks of the Kozlowski residence. The car was searched and bloodstains were found on it. A purse, a roll of black electrical tape, some bits of electrical tape, an ATM receipt, some cans of Coke and a bag from a 7-Eleven store were also found in the car. Fremont police obtained a warrant to search Kozlowski's residence.

A taxi picked up two passengers in Newark on July 6 in the early morning hours. The taxi driver noticed that a police officer parked near an intersection flashed a searchlight through the cab during the drive. The police car drove rapidly in pursuit of the cab. When the driver came to a stop, one of the two men got out of the cab and ran away. The other man stayed in the cab. The remaining passenger identified himself to police as "Joe." The officer noticed that his hands were scarred; he recalled hearing at a briefing that Kozlowski's hands were scarred. The officer asked the young man his name again and this time, the man identified himself as Matthew Kozlowski. He was handcuffed by police.

Gatson appeared at the home of his aunt on July 6. She spent part of the day with him until she left him at the Union City BART station at his

request. He was very quiet all day. The following day, he was arrested on July 7 at United Nations Plaza in San Francisco. When asked if he knew why law enforcement officers were contacting him, Gatson replied, "Yeah. That Fremont thing." A San Francisco police officer heard Gatson say: "I screwed up. I just lost control." Among Gatson's personal effects were keys to Robyn's car and her residence. He had tattoos on his hands.

Police showed Lisa and Robyn photographic lineups, but the girls were unable to identify their attackers. However, when Lisa saw Gatson on television during her hospital stay, she recognized him.

## C. *Pretrial Matters*

In September, Kozlowski and Gatson were charged by information with two counts of kidnapping for extortion, two counts of robbery, two counts of premeditated attempted murder and a single count of carjacking. Each count also included allegations of use of a deadly weapon and infliction of great bodily injury. (See §§ 187, 211, 215, 664; see former §§ 209, subd. (a), 12022, subd. (b), 12022.7, subd. (a).) The information also alleged that Gatson had suffered two prior convictions. (See §§ 667, subds. (a), (e)(1), 1170.12, subd. (c)(1); see also former § 667.5, subd. (b).[8]) In October, Kozlowski and Gatson each moved to set aside the two kidnapping for extortion counts and the premeditated allegation of the two attempted murder charges in the information. (See § 995.) Both motions were denied. Kozlowski and Gatson each moved to sever his trial from that of the other. Alternatively, Gatson argued that statements Kozlowski made should be suppressed. These motions were also denied. (See § 1098.)

In December, the People moved to admit Gatson's prior convictions for impeachment purposes if he chose to testify. The trial court granted this motion. On Gatson's motion, trial of the current charges was bifurcated from trial on the allegations of his prior convictions. His motion to prohibit mention of gang activity was granted in part and denied in part.

The prosecution gave Kozlowski and Gatson notice of its intent to call jailhouse informant Anthony Jacobs as a witness at trial. Gatson moved to suppress a statement allegedly made by him to Jacobs. The trial court denied the motion. Gatson moved in limine to preclude the prosecutor from referring during opening statement to a statement attributed to him—that the last time he let a girl go, she identified him in court. That motion was denied, but his motion to preclude mention of a statement about being released from San Quentin State Prison was granted.

---

[8]See footnote 2, *ante.*

D. *Trial*

At trial, both Lisa and Robyn testified about the events of the night of July 4-5. Lisa was positive that Gatson was the man who had shot and stabbed her. She was also positive that Kozlowski was the man who had been with Gatson that night. Robyn also identified Kozlowski and Gatson in court and noted the tattoos on Gatson's hands.

Reann and Natasha testified about their activities that night, verifying some details of the testimony Lisa and Robyn gave about the events leading up to the kidnappings and assaults. They told the jury that they became concerned when Lisa and Robyn left with Kozlowski and did not return. With Holly's help, they contacted Anthony, who helped them look for Lisa and Robyn in places where he thought his brother might be staying, but they did not find Lisa, Robyn or Kozlowski.

Eventually, Reann and Natasha learned that Lisa and Robyn were in a hospital and that the police were looking for them to aid in an investigation. They told police everything they knew, including names and descriptions. Two weeks later, Reann and Natasha each identified Kozlowski and Gatson in separate photographic lineups. Reann, Natasha and Holly each identified Kozlowski and Gatson in court at trial.

Anthony also testified. He recalled that on July 4, Gatson had a gun in his waistband. The next day, he received a telephone call from his brother.[9] Anthony explained that friends had been looking for Lisa and Robyn, who had been found without their car. He told the jury that Kozlowski asked "What happened? Did they die?" He believed that both his brother and Gatson had been using methamphetamine at that time, as he himself had.

A friend of Kozlowski's testified that when he went to bed on the night of July 4-5, neither Kozlowski nor Gatson was there. About 5:30 a.m., he woke, saw that both men were in his apartment, and heard Kozlowski on the telephone. When the friend asked Kozlowski why he was only wearing his boxer shorts, Kozlowski said that he sold his clothes.[10] Kozlowski and Gatson left his apartment about 8:00 a.m., Kozlowski wearing clothes borrowed from his friend.

Debris from a fire was found at a school near the apartment where Kozlowski and Gatson had slept. A belt buckle, an empty Coke can and what appeared to be a lipstick container were found in the debris. Robyn's cell phone and ATM card were also found near the school.

---

[9]Evidence of this conversation was admitted against Kozlowski only, not against Gatson.

[10]This evidence was admitted against Kozlowski alone, not against Gatson.

A nurse at the hospital gave a deputy sheriff a piece of electrical tape that paramedics had removed from around Lisa's wrists. A doctor opined that Robyn's stab wounds and the surgical incision would result in lifelong scarring. He told the jury that if Robyn's injuries had been left unattended for much longer, she would probably have bled to death. He suggested that some of the wounds both girls suffered could have been inflicted with a short-bladed knife, but that Robyn's abdominal wounds were inflicted by a longer knife.

A fingerprint expert testified that he was certain that prints found on Robyn's car matched Gatson's fingerprints. He was unable to match any of the latent prints he lifted to Kozlowski's fingerprints. The jury saw surveillance videotapes from the two 7-Eleven stores. Still photographs from one of the videotapes showing Kozlowski were also admitted into evidence. The jury viewed the sites of the two 7-Eleven stores and the scene of the stabbings at Palomares Road.

After a witness mentioned seeing a parole officer escorting Gatson after his arrest, Gatson moved for a mistrial. The motion was denied but the trial court offered to give a curative jury instruction if Gatson chose to offer one. Neither Kozlowski nor Gatson offered any defense. Kozlowski and Gatson both moved for an acquittal of the kidnapping charges, without success. (See § 1118.1.)

The jury found Kozlowski and Gatson guilty of all charges and found all enhancement allegations to be true. In a court trial, Gatson admitted two prior conviction allegations were true.[11] The trial court accepted these admissions.

Kozlowski's motion for new trial was denied. He was sentenced to two indeterminate sentences of life imprisonment without possibility of parole for the kidnapping for extortion convictions and two terms of life imprisonment with possibility of parole for the attempted murder convictions. The life terms were ordered to run consecutively. Additional terms of four months on each deadly weapon use enhancement and one year for each great bodily injury enhancement were imposed but stayed on multiple punishment grounds. (See § 654.) No sentence was imposed on the remaining charges in order to avoid violating the ban on multiple punishment. (See *ibid.*) Kozlowski was ordered to pay a $50,000 restitution fine and a $50,000 parole revocation fine. (See § 1202.45; former § 1202.4, subd. (b).) Gatson's

---

[11]The trial court also found that Gatson had violated the terms of a grant of probation. His probation was terminated. He raises no issues on appeal pertaining to the probation violation finding.

sentence was identical, but for the addition of two more consecutive terms—of five years and one year—for his prior convictions.

## II. Kidnapping for Extortion

### A. *Extortion of Property*

■ First, Kozlowski and Gatson contend that they cannot lawfully be convicted of kidnapping for extortion because the PIN codes that they obtained from Lisa and Robyn do not constitute property that may be extorted under California law. At trial, they stood accused of kidnapping Lisa and Robyn "to commit extortion and to exact from another money and other things of value." The trial court instructed the jury that one who obtained a PIN code from another with her consent when that consent was induced by a wrongful use of force or fear committed extortion for purposes of kidnapping for extortion. The court also referred to a PIN code when it gave other instructions on consent and causation relating to the crime of kidnapping for extortion.

In its opposition to the motions to set aside the kidnapping for extortion counts of the information, the People stated that the "valuable thing" extorted from Lisa and Robyn were their PIN codes.[12] During closing argument, the prosecution referred several times to extortion of the girls' PIN codes. The verdict forms by which the jury recorded their findings of guilt on the kidnapping for extortion charges used the same language as the information—the extortion of "money and other things of value." Thus, it is clear that the trial court and the prosecution assumed that a PIN code was property capable of being extorted and that this was the sole theory of kidnapping for extortion that was presented to the jury.

In July 1999 when these offenses were committed, section 209 made it a felony for one to kidnap someone in order to commit extortion. (See former § 209, subd. (a).) Our Penal Code defines extortion as "the obtaining of *property* from another, with his [or her] consent, . . . induced by a wrongful use of force or fear . . . ." (§ 518, italics added; see § 7 [masculine gender includes feminine].) Kozlowski and Gatson argue that, as a matter of law, a PIN code is not *property* that may be extorted, but is merely an intellectual construct that cannot be exclusively possessed. Thus, they contend that their convictions for kidnapping for extortion violate their federal and state

---

[12]The motions to set aside the kidnapping for extortion counts in the information filed by Kozlowski and Gatson did not challenge the information on the ground now asserted on appeal. However, as this claim of error presents a purely legal question—whether the obtaining of a PIN code under duress can ever constitute extortion—we are satisfied that the question need not have been raised in the trial court to be preserved for review on appeal.

constitutional rights to due process and must be reversed. (See U.S. Const., 14th Amend.; Cal. Const., art. I, § 15.) They also reason that as these convictions were unsupported by substantial evidence, the constitutional ban on double jeopardy bars any retrial on these counts—a result that would void the terms of life imprisonment without possibility of parole imposed for these offenses. (See U.S. Const., 5th & 14th Amends.; Cal. Const., art. I, § 15.)

The issue of whether a PIN code constitutes property for purposes of extortion appears to be one of first impression in this state.[13] In order to determine this issue, we must construe the relevant statutes. ■ This is so because no act is criminal or punishable except as prescribed by the Penal Code of the State of California. The power to define crimes and fix penalties is vested in the Legislature. (*Keeler v. Superior Court* (1970) 2 Cal.3d 619, 631 [87 Cal.Rptr. 481, 470 P.2d 617, 40 A.L.R.3d 420]; see §§ 4, 6.) Courts may not create a criminal offense by enlarging a statute or giving its terms false or unusual meanings. Penal statutes may not be made to reach beyond their plain intent, covering only crimes coming clearly within the statutory language. These laws must be construed according to the fair import of its terms. (*Keeler v. Superior Court, supra,* 2 Cal.3d at p. 632; see § 4.)

■ The term "property" as used in the Penal Code includes personal property such as money, goods, chattels, things in action and evidences of debt. (§ 7, subds. 10, 12; see *People v. Baker* (1978) 88 Cal.App.3d 115, 119 [151 Cal.Rptr. 362].) By its terms, subdivision 12 of section 7 does not create an exclusive list of personal property limited to those specifically named. (See *People v. Leyvas* (1946) 73 Cal.App.2d 863, 865 [167 P.2d 770].) ■ Thus, the fact that a PIN code is not specifically enumerated as property in section 7 does not compel a finding that it is not property capable of being extorted.[14]

Kozlowski and Gatson assume that the definition of *property* for purposes of extortion is narrow. Witkin advises us that the contrary is true—that the term "property" as used in the California's extortion statute should be *broadly* interpreted. (See 2 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Crimes Against Property, § 104, p. 137; see generally Annot., What

---

[13] A recent Massachusetts case assumes without discussion that one who extracts a PIN code by threatening means commits extortion. (See *Commonwealth v. Baldwin* (2001) 52 Mass.App. 404, 407 [754 N.E.2d 121, 122, 124].)

[14] Such enumeration is found in section 484e, dealing with theft of an access card, where "access card" is defined as "any card, plate, code, account number, or other means of account access that can be used, alone or in conjunction with another access card, to obtain money, goods, services, or any other thing of value . . . ." (§ 484d, subd. (2), italics added.) For purpose of theft, our Legislature has expressly recognized a PIN code as property.

Constitutes "Property" Obtained Within Extortion Statute (1975) 67 A.L.R.3d 1021.) Another commentator has also rejected a narrow interpretation of the term "property" for purposes of extortion, suggesting that the nature of the crime of extortion—one in which the property is obtained by consent—requires that the term be used "in an unrestricted sense." (See Note (1934) 22 Cal. L.Rev. 225, 226.) "[T]here is not the same need in extortion for a narrow definition of 'property' as in robbery, as the acts sought to be punished by the crime of extortion often result in the obtaining of things of value which would not be subject to robbery from the person." (*Id.* at p. 227, fn. omitted.) We conclude on the basis of these authorities that a broad interpretation is appropriate when construing the term "property" for purposes of extortion.

■ Of course, all terms set out in our Penal Code must be construed in context. (§ 7, subd. 16.) When construing the statutory definition of property for purposes of extortion, we may consider robbery cases and cases involving other larceny offenses as well as those specifically related to the crime of extortion. We find this to be appropriate because the crime of extortion is related to the offense of robbery; indeed, courts have sometimes found it difficult to distinguish these two offenses. (*People v. Torres* (1995) 33 Cal.App.4th 37, 50 [39 Cal.Rptr.2d 103]; *People v. Hesslink* (1985) 167 Cal.App.3d 781, 790 [213 Cal.Rptr. 465].) The statutory definitions of robbery and extortion are structurally similar. (*People v. Hesslink, supra,* 167 Cal.App.3d at p. 790.) Both offenses have their roots in common law larceny and both share a common element—acquisition by means of force or fear. (*People v. Torres, supra,* 33 Cal.App.4th at p. 50.) The two crimes are distinguishable—in an extortion, the property is taken with the victim's consent, while in a robbery, the property is taken against the victim's will. (*People v. Chacon* (1995) 37 Cal.App.4th 52, 63 [43 Cal.Rptr.2d 434].)

Cases and statutes define the term "property" in the context of theft-based offenses as the exclusive right to use or possess a thing or the exclusive ownership of a thing. (*People v. Kwok* (1998) 63 Cal.App.4th 1236, 1250-1251 [75 Cal.Rptr.2d 40] (*Kwok*) [taking of lock to make unauthorized copy of key was theft]; *People v. Sadowski* (1984) 155 Cal.App.3d 332, 335 [202 Cal.Rptr. 201, 55 A.L.R.4th 1075] [cat as property for purposes of theft]; see Civ. Code, § 654.) The term is all-embracing, including every intangible benefit and prerogative susceptible of possession or disposition. (*Kwok, supra,* 63 Cal.App.4th at p. 1251.) The right to own property implies the right to possess or use a thing to the exclusion of others. (*State of California v. Superior Court* (2000) 78 Cal.App.4th 1019, 1027 [93 Cal.Rptr.2d 276].)
■ With these general concepts in mind, we turn to the specific issue before us—whether a PIN is "property" for purposes of extortion.

A PIN is a code number that operates as a means of account access. (See *People v. Butler, supra,* 43 Cal.App.4th at p. 1235.) We may take judicial notice of the common knowledge that a PIN code is more valuable if not disclosed to others—or, put another way, if it is exclusively possessed. (See Evid. Code, §§ 452, subd. (g), 459, subd. (a).) In like manner, the means to bank account access is an intangible benefit susceptible of possession. (See *Kwok, supra,* 63 Cal.App.4th at p. 1251.) Thus, it may reasonably be said that a PIN code is property because it implies the right to use that access code—and to access the funds in the related bank account by means of that code. (See *State of California v. Superior Court, supra,* 78 Cal.App.4th at p. 1027.) Operating as it does as a means of account access, a PIN code can be characterized as intangible property. (See *People v. Butler, supra,* 43 Cal.App.4th at p. 1235.)

Kozlowski and Gatson argue that a PIN code is no more than a means to obtain property—merely a series of numbers that serves as an access device. They contend that it is a condition or concept *incidental* to the transfer of property, but not tangible property that can be owned or exclusively possessed in and of itself. (See *People v. Butler, supra,* 43 Cal.App.4th at p. 1235; see also 18 U.S.C. § 1029(e)(1) [defining PIN as access device for purposes of federal criminal fraud provisions]; *People v. Parker* (1963) 217 Cal.App.2d 422, 426-427 [31 Cal.Rptr. 716] [receiving stolen property conviction proper when defendant obtained confidential telephone directory supplements offering new telephone listings, and copied and returned them]; but see *People v. Dolbeer* (1963) 214 Cal.App.2d 619, 622-624 [29 Cal.Rptr. 573] [finding paper listing information was property, but suggesting in dicta that information alone might not be property].)

The gist of this claim of error appears to be that a PIN code cannot be property for purposes of extortion because it is not tangible. However, the term "property" in the Penal Code specifically includes within its definition intangible property. (See § 7, subd. 12.) A thing in action is a right to recover money or other personal property by a judicial proceeding, such as a right of action for personal injury, breach of contract or fraud. (Civ. Code, § 953; see *People v. Baker, supra,* 88 Cal.App.3d at p. 119.) Thus, the right to take and prosecute an appeal has been held to be property within the meaning of our extortion statute. (*People v. Cadman* (1881) 57 Cal. 562, 563-564; *People v. Baker, supra,* 88 Cal.App.3d at p. 119.) The statutory right to file a protest with the Alcoholic Beverage Control Board is also considered property within the meaning of our extortion law because it is a thing in action. (See *People v. Baker, supra,* 88 Cal.App.3d at p. 119.) These are all examples of intangible items which are expressly included within the definition of property within the Penal Code. Thus, the fact that a PIN code

is intangible property does not preclude a finding that it constitutes property within the meaning of our extortion statute.

Although there are no cases directly on point, we find one involving a house key that persuades us to find that a PIN code is property for purposes of kidnapping for extortion. In *Kwok, supra,* 63 Cal.App.4th 1236, a defendant was convicted of two counts of residential burglary. He went to his victim's home when he knew she was away, used a code number to open her garage door and entered the garage. The interior of the victim's home could be entered by means of a door inside the garage. Without the victim's knowledge, Kwok removed a lock from this interior door, took it to a locksmith, had a key made for the lock, retained the newly made key and replaced the lock in its original position. A month later, he returned to the home, entered the garage by using the coded garage door opener and entered the unlocked interior door—apparently, without needing to use the key. When the victim returned home, he assaulted her. (*Id.* at pp. 1240-1245.)

On appeal, Kwok argued that there was insufficient evidence to support the first count of residential burglary—based on his removal of the lock and making a key to fit it. He contended that there was insufficient evidence of an intent to commit a theft or felony at the time of entry. He reasoned that he could not be guilty of the theft of the lock because he had no intent to permanently deprive his victim of her lock—only to remove the lock temporarily in order to make a key that fit it. Implicit in this argument was a second one—that his act of making and retaining an unauthorized key to his victim's home did not itself constitute theft. (*Kwok, supra,* 63 Cal.App.4th at pp. 1245, 1248-1249.)

The appellate court found little California authority on the question of whether making an unauthorized copy of a key constituted theft, but found persuasive a Wyoming Supreme Court opinion concluding that theft had been committed when the defendant retained a copy of the victim's keys, even though the original keys were returned to the victim. Both courts noted that copying the key deprived the victim of something valuable—in that case, her right to have exclusive access to her home and vehicle. The value of the original key was diminished by the copies that were made and retained because an unwanted person also had access to the home and vehicle. (*Kwok, supra,* 63 Cal.App.4th at pp. 1249-1250; see *Dreiman v. State* (Wyo. 1992) 825 P.2d 758, 761.) The California appellate court reasoned that a house key is property. Even if the victim retains other copies of the key, the defendant's unauthorized possession of the stolen key impairs the victim's right of ownership—the exclusive possession and use—of the house. (*Kwok, supra,* 63 Cal.App.4th at p. 1251.)

Applying *Kwok*, the People argue that when Kozlowski and Gatson compelled Lisa and Robyn to reveal their PIN codes—in effect, the "key" that "unlocked" their bank accounts and allowed access to their bank funds at an ATM—the victims lost the ability to control access to those funds. For their part, Kozlowski and Gatson counter that *Kwok* is distinguishable because in that case the defendant made a tangible object—a key—from the article that he took from the victim. We disagree. Our reading of *Kwok* satisfies us that it is the intangible loss, not the tangible one, that prompted its ruling. In that case, while the house key itself was a tangible object, the real harm that its making created was that harm to the owner's intangible ability to control access to the house. (See *Kwok, supra,* 63 Cal.App.4th at p. 1251.)

The *Kwok* court held that making an unauthorized copy of a borrowed key—like making an unauthorized copy of a trade secret or of computer data—destroys the intangible benefit and prerogative of being able to control access to one's residence as much as theft of the key would do. (*Kwok, supra,* 63 Cal.App.4th at p. 1251.) In like manner, when Kozlowski and Gatson compelled Lisa and Robyn to reveal their PIN codes, that knowledge destroyed the intangible benefit of being able to control access to the bank accounts. The intangible property taken—the PIN codes—were the means to obtain the more tangible property—the bank funds—contained in those accounts.

Nevertheless, Kozlowski and Gatson argue that a PIN code has no intrinsic value—that it only becomes valuable when used in conjunction with an ATM card. This argument has a facial appeal, but we find it unpersuasive. Unless the holder has both the tangible ATM card and the intangible PIN code, the holder cannot access any funds in the account. In our case, the evidence establishes that Kozlowski and Gatson obtained the PIN codes from Lisa and Robyn after finding each girl's ATM card in her purse. Thus, their own conduct supports a finding that the joint possession of the ATM cards and the necessary PIN codes rendered both the cards and the PIN codes valuable.

For all these reasons, we conclude that a PIN code constitutes property for purposes of kidnapping for extortion.

B. *Sufficiency of Evidence*

1. *Extortion of Money or Valuable Property*

Next, Kozlowski and Gatson raise several challenges to the sufficiency of evidence to their convictions for kidnapping for extortion, arguing first that

they cannot be guilty of this offense because they did not extort money or valuable property as required by former section 209. They contend that, for this reason, the prosecution failed to adduce sufficient evidence of kidnapping for extortion. As such, Kozlowski and Gatson argue that their convictions violate both federal and state due process because there was insufficient evidence of every element of the charged offense. (See U.S. Const., 14th Amend.; Cal. Const., art. I, § 15.) They also reason that the constitutional ban on double jeopardy bars any retrial of these kidnapping charges. This claim of error turns on the success of their related claim that a PIN code is not property that may be extorted within the meaning of kidnapping for extortion. As we have already rejected that contention, this claim of error necessarily fails, as well. (See pt. II.A., *ante.*)

### 2. *Secondary Extortion Victim*

Kozlowski and Gatson also argue that there was insufficient evidence to support their convictions for kidnapping for extortion because there was only a single victim for each offense. They contend that kidnapping for extortion pursuant to former section 209 necessarily requires two victims for each offense—one victim who is kidnapped and a second victim from whom the accused extorted property. They reason that this distinction is essential because it allows us to distinguish between the different punishments imposed for kidnapping for extortion and kidnapping for robbery or rape. Kozlowski and Gatson contend that their convictions of kidnapping for extortion violate state and federal due process because the People did not prove all elements of the offense—that is, a second victim for each offense. (See U.S. Const., 5th & 14th Amends.; Cal. Const., art. I, § 15.) They raised this issue in the trial court without success in their motion to set aside the kidnapping charges in the information.

On appeal, Kozlowski and Gatson couch this claim as one of statutory interpretation, arguing that because the applicable statute can reasonably be construed in the manner that they suggest, they are entitled to the benefit of any doubt about the meaning of its language. In 1999, section 209 made it a felony for "[a]ny person who . . . kidnaps . . . another person . . . for ransom, reward or to commit extortion *or* to exact from another person any money or valuable thing, or [for] any person [to aid or abet] any such act . . . ." (Former § 209, subd. (a), as amended by Stats. 1997, ch. 817, § 2, italics added.) Courts interpreting this provision against similar challenges have concluded that kidnapping for extortion does not require that the person being extorted be someone other than the kidnap victim. (*People v. Ibrahim* (1993) 19 Cal.App.4th 1692, 1693, 1696-1698 [24 Cal.Rptr.2d 269]; see *People v. Superior Court (Deardorf)* (1986) 183 Cal.App.3d 509, 513-514

[228 Cal.Rptr. 137]; *People v. Preston* (1971) 21 Cal.App.3d 732, 735 [98 Cal.Rptr. 765].) ■ One court explained that because the statute was phrased in the disjunctive, it listed four different types of aggravated kidnapping: (1) for ransom, (2) for reward, (3) to commit extortion, and (4) to exact money or other valuables from another. Construing the statute's language, the court concluded that in only the last of these four types of aggravated kidnapping does the law require both a primary and a secondary victim. (*People v. Ibrahim, supra,* 19 Cal.App.4th at p. 1696.)

■ In two other decisions, courts have suggested in dicta that even aggravated kidnapping for extortion is a two-victim crime involving a primary kidnap victim and a secondary extortion victim. (*People v. Chacon, supra,* 37 Cal.App.4th at p. 63 [kidnapping for ransom case]; *People v. Martinez* (1984) 150 Cal.App.3d 579, 590-591 [198 Cal.Rptr. 565], disapproved on another point in *People v. Hayes* (1990) 52 Cal.3d 577, 628, fn. 10 [276 Cal.Rptr. 874, 802 P.2d 376], cert. den. *sub nom. Hayes v. California* (1991) 502 U.S. 958 [112 S.Ct. 420, 116 L.Ed.2d 440]; see *People v. Ibrahim, supra,* 19 Cal.App.4th at pp. 1696-1697 [rejecting this interpretation of *Martinez*].) Citing these cases, Kozlowski and Gatson reason that there are two conflicting lines of case law and argue that we should find the *Chacon-Martinez* cases more persuasive than *Ibrahim*. Like the *Ibrahim* court before us, we read the suggestions in *Chacon* and *Martinez* as dicta and decline to elevate them to law. Thus, we find no conflict in the case law. (See *People v. Ibrahim, supra,* 19 Cal.App.4th at p. 1697.) One may lawfully be convicted of kidnapping for extortion even if the kidnap victim and the extortion victim are the same person. (See, e.g., *id.* at pp. 1696-1698.)

## C. *Vagueness Challenge*

In a related claim, Kozlowski and Gatson contend that former section 209—the kidnapping for extortion statute—is unconstitutionally vague as applied to them because the provision is ambiguous about whether a secondary extortion victim is required for the commission of this offense. They argue that the ambiguous statute did not give them adequate notice of the prohibited conduct. Their conduct was more like kidnapping for robbery than kidnapping for extortion, they reason. Thus, they conclude that their convictions of kidnapping for extortion violate their due process rights and must therefore be reversed. (See U.S. Const., 5th & 14th Amends.; Cal. Const., art. I, § 15.) Uncertain statutory language may pose vagueness issues raising due process concerns. (See *In re Davis* (1966) 242 Cal.App.2d 645, 656 fn. 12 [51 Cal.Rptr. 702].) However, in order to establish a due process issue, we must first find that the statute is ambiguous. We have already rejected a related claim. (See pt. II.B., *ante.*) We do not find this claim of error to be persuasive, either.

Kozlowski and Gatson rely on language in *Ibrahim* suggesting that in cases in which there is no secondary victim, the distinction between kidnapping for robbery and kidnapping for extortion is too subtle to warrant such different punishments—life imprisonment with possibility of parole for the former and life imprisonment without possibility of parole for the latter. (*People v. Ibrahim, supra,* 19 Cal.App.4th at pp. 1698-1699.) In dicta, *Ibrahim* called on the Legislature to reconsider its sentencing laws. However, that decision does not stand for the proposition that former section 209, subdivision (a) is ambiguous or violates due process. We are satisfied that the former kidnapping for extortion statute applied in this case was unambiguous and did provide Kozlowski and Gatson with sufficient notice of the conduct it intended to prohibit.

## III.-V.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## VI. REMITTITUR

The sentences of Kozlowski and Gatson are each modified to reduce the section 1202.4 restitution fine to $10,000 and to strike the section 1202.45 parole revocation fine. A modified abstract of judgment shall be prepared to reflect the lawful fines. In all other respects, the judgments are affirmed.

Kay, P. J., and Sepulveda, J., concurred.

A petition for a rehearing was denied March 28, 2002, and appellants' petitions for review by the Supreme Court were denied May 15, 2002.

---

*See footnote, *ante*, page 853.