Order modifying opinion filed 3/18/16

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>RONNIE PADILLA,<br><br>    Defendant and Appellant. | A139259<br><br>(Alameda County<br>Super. Ct. No. CH-44529A)<br><br>**ORDER MODIFYING OPINION [CHANGE IN JUDGMENT]** |

BY THE COURT:

It is ordered that the opinion filed herein on March 18, 2016, be modified as follows:

The disposition is modified to read:

"The conviction for aggravated kidnapping (count 11) is reversed with directions as follows:  If the district attorney does not elect to retry the aggravated kidnapping charge within 60 days after the filing of the remittitur in the trial court pursuant to Penal Code section 1382, subdivision (a)(2)—unless time is waived by defendant—the trial court shall proceed as if the remittitur constituted a modification of the judgment to reflect a conviction for kidnapping and shall resentence defendant accordingly.  In the event the district attorney elects to retry defendant as specified, the trial court shall thereafter enter judgment consistent with the results of retrial and with that portion of the prior judgment unaffected by this decision.  In all other respects, the judgment is affirmed."

The petition for rehearing is denied.

Dated:_____                          _____
                                                     Kline, P.J.

A139259; *People v. Padilla*

2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>RONNIE PADILLA,<br><br>        Defendant and Appellant. | A139259<br><br>(Alameda County<br>Super. Ct. No. CH-44529A) |

Defendant Ronnie Padilla was convicted by a jury of 13 crimes arising out of four different incidents that took place in 2005, 2006, and 2008.  He asserts three errors on appeal.  First, he contends that the trial court committed prejudicial instructional error on a charge of kidnapping for ransom (count 11).  Second, he contends there was insufficient evidence to support his conviction on that charge.  Third, he contends that he received ineffective assistance of counsel due to his counsel's failure to seek severance of non-gang related charges from gang-related charges and to oppose consolidation of a custodial weapon possession charge.  We reject his ineffective assistance of counsel claim, but we agree that the trial court committed instructional error on count 11, an error that was prejudicial and requires reversal on that count.  We therefore affirm in part and reverse in part.

## FACTUAL BACKGROUND

### November 12, 2005 Incident (Counts 3 through 5)

On an afternoon in late October or early November 2005, Apolinar Mendoza parked his red Camaro in front of a taqueria on International Boulevard in Oakland.

1

Before he could get out, another car—a red Pontiac—pulled up next to him. Defendant, whom Mendoza had never seen before, got out of the driver's seat and tried multiple times to open the door to Mendoza's car, saying he wanted to hit or kill Mendoza. Defendant was also pounding on the window. After 10 to 15 minutes, defendant got back in the red Pontiac and drove away. Mendoza had no idea what the incident was about. He asked some people at the scene about the man who had gotten out of the other car, and he then drove home. At trial, Mendoza identified defendant as the assailant.

On the afternoon of November 12, 2005, Mendoza was driving southbound on International Boulevard on his way home. He noticed the same red Pontiac following him. Feeling fearful, he sped up to try to get away, but the Pontiac followed him. In his rearview mirror, Mendoza could see defendant driving the car with one or two passengers. Mendoza turned left on Fruitvale Avenue and made the first right on Farnam Street. The Pontiac continued past Fruitvale Avenue, taking the next left on 34th Avenue and the first left on Farnam Street so that it was headed towards Mendoza. With defendant still driving, one of the passengers began shooting at Mendoza, firing seven or eight times. Mendoza's car was struck by gunfire in the passenger seat, the hood, the driver's side window, the windshield, and the taillight.

Mendoza drove home and called the police. He told the responding officer that he believed the driver of the Pontiac was named Ronnie. He also said that the car had tinted side windows.

At trial, Mendoza initially testified that he could not remember if the Pontiac he saw that day had tinted windows. He testified a few minutes later that he believed the windows of the Pontiac were black, but he did not remember if the driver's side window was black or tinted. He also testified when he told the officer on the day of the incident that the Pontiac's windows were tinted, he was referring only to the Pontiac's two back windows.

Lillian Cabrera witnessed the incident. She was in her car at a stop sign on 34th Avenue. She saw a red car (Mendoza's car) turning right off Farnam Street onto 34th Avenue and a second red car with only the driver and one passenger heading towards her

2

on 34th Avenue. As Mendoza's car was turning, the second car turned left in front of her onto Farnam Street, and someone in that car started shooting at Mendoza's car. Mendoza continued to make a right turn onto 34th Avenue and drove down the street in front of Cabrera. The shooter's car continued on Farnam Street towards Fruitvale Avenue. Cabrera called 911, related what she had seen, described both cars as red Camaros, and provided the license plate number for the victim's car.

Oakland Police Sergeant Drennon Lindsey, who worked as an investigator in the robbery and gang sections, was assigned to investigate the shooting. The police report contained a license plate number for the suspect vehicle. A search of the plate revealed that the registered owner of the car (a red Pontiac Grand Am) had the same address as defendant.

On February 15, 2006, Sergeant Lindsey showed Mendoza three separate photograph lineups: one with the photograph of the registered owner of the Pontiac, one with a suspect identified in an anonymous tip, and one with a photograph of defendant. Mendoza identified defendant as the driver of the car that chased him.

**December 31, 2005 Incident (Counts 6 through 12)**

On the afternoon of December 31, 2005, friends Edgar Acosta, Henry Bueso,[1] Javier Serrano, and Angel Duran were out together in Oakland. Serrano was driving Bueso's car (a green Ford Taurus), with Bueso in the front passenger seat and Acosta and Duran in the backseat. At trial, Acosta and Bueso testified that they had no guns or other weapons in the car.

As they were stopped at a stoplight, a blue car with three people in it pulled up next to them, and the occupants threw gang signs at them—three fingers representing a 13—and said the name South Side Locos. Acosta noticed that defendant, whom he had previously seen at Bueso's house, was in the car.[2] He pointed defendant out to Bueso,

---

[1] Bueso testified at trial that his name is Henry Eucdea, and that Bueso is his "second last name." For consistency with the briefing, we shall refer to him as Bueso.

[2] Acosta testified that defendant was in the backseat behind the driver, while Duran and Bueso both placed defendant in the driver's seat.

who became nervous. Bueso had heard defendant was looking for him because his girlfriend, Jennifer, was the stepdaughter of defendant's brother, and defendant's brother did not want Bueso dating Jennifer.

Defendant got out of the car holding a gun down at his side and walked around the Taurus looking for Bueso. Bueso yelled, "Let's go, let's go, let's go. Ronnie is going to kill me. Ronnie is going to kill me," and Serrano sped away. Defendant got back into the blue car and started following them. As the blue car was chasing them, defendant fired several shots at them, as did another occupant of the car.

After a 15-minute pursuit, the blue car bumped the Taurus, causing Serrano to lose control of the car, which hit a curb, blew out a tire, and crashed. Bueso, Serrano, and Duran all got out and fled, but Acosta was unable to get away before defendant walked up with the gun in his hand and told him not to move or he would shoot. As Acosta leaned against the car, defendant pointed the gun at him and pulled the trigger Although Acosta heard a click, no bullet fired because the gun was out of ammunition. Defendant and his two companions forced Acosta into the backseat of their car, defendant hitting him to get him into the car. Defendant sat in the backseat with Acosta and told him to lie down and keep his eyes closed. Acosta heard defendant call someone and say that he needed another gun because his was out of ammunition.

They left the crash scene and drove to another location, where defendant exchanged his gun for a new one with ammunition. As they were driving, defendant was demanding to know where Bueso lived, telling Acosta he should deliver Bueso to him. Acosta refused to take defendant to Bueso, and defendant told him he was going to die. Defendant repeatedly tried to get Acosta to call Bueso, but Acosta instead dialed other numbers because he was "not a betrayer." The whole time, Acosta believed he was going to be killed.

They drove to a location in the Oakland hills, defendant all the while pointing the loaded gun at Acosta. When the car stopped, Acosta believed he was going to die. Defendant was still demanding information about Bueso, but Acosta repeatedly told him

4

he did not know where Bueso lived. Acosta in fact knew where Bueso lived, but he was not going to tell defendant, even if it cost him his life.

Defendant forced Acosta to give him his own telephone number, telling Acosta he was going to call him so he, Acosta, would deliver Bueso to him. He also took a photograph of Acosta with his cell phone, telling Acosta that if he came to court, he was going to hurt Acosta's family. While Acosta was still in the car, defendant took $220 from him.

Ignoring his companions' suggestion that he kill Acosta so he would not go to the police, defendant told Acosta to get out of the car. Standing outside the car, defendant put his arm around Acosta and told him to close his eyes. Acosta believed it was his last day on earth. Instead, defendant told him he was going to let him live so he could give him Bueso, instructing him to walk away without looking back lest defendant shoot him. Acosta then walked home.

Defendant contacted Acosta the following day and demanded to know where Bueso was, threatening to harm his family if he would not tell him. Defendant contacted him "many" times after that. Acosta also saw defendant walking near his house on several occasions.

Meanwhile, after having run away following the crash, Bueso, Duran, and Serrano returned to the crash scene and reported to the police what had happened.

Isaac Ruelas witnessed the immediate aftermath of the accident. He was driving down 42nd Avenue towards Foothill when he heard a noise and saw two cars that had just been involved in an accident on the opposite side of the traffic island from where he was driving. According to Ruelas, a blue Dodge appeared to have hit a green Ford, which "looked like something had T-boned it, hit the back of it and caused it to run into the island." Three men were running from the scene, all in different directions. None of them appeared to have anything in his hands.

Defendant and two others got out of the blue Dodge while it was still moving. It continued to roll away, and they tried to stop it. At the same time, defendant, who was standing in front of the green car, started flashing a '3' sign, along with some other

5

gestures. Ruelas's view of defendant's companions' hands was obstructed, but their mannerisms made it appear as if they had something in their hands.

Defendant and another man then pulled a man out of the Ford. According to Ruelas, he was "getting scuffed up"—"they hit him a couple of times before they put him in the vehicle"—and "didn't appear to be doing anything willingly." After he was thrown into the back of the blue car, two men got in the back with him, and another drove off.

Ruelas stopped and called 911. Five minutes later, police officers arrived and took his statement. As he was there, the three men who had fled returned.

Ruelas told the officer that the man who flashed the gang sign had a tattoo on the right side of his neck. Ruelas acknowledged at trial that defendant did not have such a tattoo, but that did not surprise him because "things were moving fast." Ruelas denied that he in fact had not seen anyone flash gang signs but had instead been told that by a driver in a vehicle behind him.

The investigation of the December 31, 2005 incident was assigned to Sergeant Lindsey. On January 4, 2006, she showed Ruelas a series of photos. He identified defendant as one of the men in the blue Dodge, and he again identified him in court.

Acosta, Bueso, and Duran were also shown photo lineups and identified defendant as one of the assailants.

Defendant was arrested driving away from his home on January 19, 2006. A blue Dodge Dynasty found at that location had damage consistent with the victims' report that the blue car had rammed the Taurus. There were also a number of guns, as well as drugs, found at the house.

Defendant was interviewed the day of his arrest. At the time of the interview, defendant had a tattoo on his forehead that said "Killer" and another that said "13." On the back of his neck, he had a tattoo of the number "666." He also had spider web tattoos on his arms and elbows, which defendant indicated meant he had some sort of rank in the gang.

6

Defendant told the police that his niece, Jennifer, was dating Bueso, and the family—especially her father, Victor, whom defendant considered a brother—was having a problem with Bueso. According to defendant, Bueso was disrespectful to the family. About two weeks before the December 31 incident, Bueso called defendant and threatened him. Defendant acknowledged that he was a Sureño gang member, and claimed that Bueso was a Norteño.

When asked about the December 31 incident, defendant claimed that when the car he was in approached the Taurus, Bueso "thr[e]w up the '4,' " for Norte, so defendant responded by "throwing '3' " for "Sureño, Southside, 13." Then, as defendant put it, Bueso took out his gun and "shoot me like five times, so I shoot back like ten times." Defendant and his "homies" followed the car and "hit the car hell of times" before it came to stop and all four occupants ran. Defendant acknowledged that neither his car nor anyone in it was hit by Bueso's supposed shots.

The jury heard testimony from Oakland Police Officer Eugene Guerrero, an expert in the investigation of gang-related crime in Oakland. Officer Guerrero testified at length about the Hispanic gangs active in Oakland: the Norteños, the Border Brothers, and the South Side Locos (a subset of the Sureños). He described their origins, activities (which often involved acts of violence), and rivalries. He also testified about defendant in particular, telling the jury that defendant was an admitted South Side Locos member and considered himself a shot caller who could tell his fellow gang members what acts of violence to engage in.

**October 3, 2006 Jail Incident (Counts 1 and 2)**

Santa Rita Jail in Alameda County has numerous housing units, including one unit numbered 21. Housing unit 21 is divided into six pods, A through F, and each pod has upper and lower tiers comprised of cells accommodating two inmates. In 2006, the time frame relevant here, members of two gangs—the Sureños and the Border Brothers—were separated from the rest of the population because they were notoriously violent. D and E pods housed Sureños, while other pods were for protective custody or had mixed populations. The Sureño pods had a hierarchy where someone—the "shot caller"—gave

7

the orders: "controls the Sureño pod," "kind of collects information and delegates what other inmates do in the pod." The shot caller can do good things ("getting kitties for people that come in") and bad things ("telling somebody to take somebody out," "cutting him, killing him, removing him"). In 2006, defendant and codefendant Ismael Contreras were the shot callers in D pod.

On the evening of October 3, 2006, Alameda County Deputy Sheriff Jeffrey Bennett was overseeing security in housing unit 21. At 7:30 p.m., he opened all of the cells, except for those in the lower tier of D pod, for "pod time," a time when the inmates can come out of their individual cells into the pods to use the phone, shower, watch television, and play games. After opening the cells, he noticed a large commotion in D pod, which appeared to be several inmates cornering another inmate and striking him. He left the tower to meet up with his partner, Deputy Sheriff Sean Poole, outside the pod.

Bennett and Poole walked toward the D pod door. As the deputies approached, the attackers dispersed, except for defendant, who remained behind and continued to attack another inmate, Francisco Zamora, with his fists. Poole opened the door to the pod, allowing Zamora, who was clutching his neck and had a large amount of blood on his shirt, to run out of the pod and into the dining area.

When Bennett and Poole entered the pod, defendant was walking through the pod towards the cells. Poole ordered defendant to the ground, but he ignored the order and continued walking towards cell 7. As defendant approached cell 7, two inmates— Contreras (known by the nickname "Negro") and Epifanio Quintero—could be seen inside the cell frantically washing their hands. Defendant stopped outside cell 7, and the deputies ordered all three inmates to the ground. Ignoring the order, defendant yelled something to the effect of "Fuck you, mother fuckers" and started to advance on the deputies. Contreras and Quintero also charged the deputies, who pepper sprayed all three inmates. With the inmates subdued, Poole and Bennett retreated from the pod.

Deputy Sheriff Sean Boyd and two trainees ran to housing unit 21, where they found deputies Poole and Bennett waiting for backup by the D pod door. Boyd, Poole, Bennett, and a number of other deputies then entered the pod. Defendant, Contreras and

8

Quintero were in cell 7 (defendant's and Quintero's cell), where they were ultimately detained. Inside the pod, there was a "makeshift weapon"—a rolled up playing card held together with string with a razor blade protruding from the end—on the floor, and chairs and clothing strewn around. Inside cell 1, the water in the toilet bowl was red. There was also blood inside and outside cell 1, which appeared smeared as if someone had tried to wipe it up. In a garbage can to the left of cells 6 and 7, there were five broken plastic chair legs, one of which had been filed to a point. Two razors were found inside the mattresses in cell 6, and two razor blades were found in one of the mattresses in cell 7. There was also blood in front of and inside cells 6 and 7 and on clothing worn by defendant and Contreras. The jury heard testimony that inmates at Santa Rita Jail take jail-issued razors, dismantle them, and fashion the blade into a mini knife or slashing instrument. In order to avoid injuring themselves with the blade, they make a handle with various items. The blades are often flushed down the toilet after they are used in an assault.

Meanwhile, Deputy Sheriff Steven Kidwell had also responded to the call for backup. When he arrived at D pod, he saw Zamora yelling for help with a large wound on the side of his neck. Kidwell helped Zamora use his shirt to apply pressure to the injury. He called for medical assistance and was talking to Zamora, who was coherent and conversing with the deputy. Zamora lost consciousness and momentarily passed out, but he opened his eyes again, remaining lucid for the remainder of the conversation. Kidwell feared Zamora was going to die, so he asked who assaulted him. Zamora said his name was "Negro." Zamora told Kidwell his attackers were in cells 6 and 7 and he would be able to identify photographs of them, so Zamora was shown the custody cards for the inmates assigned to those two cells. When he saw the pictures of defendant and Contreras, "[h]is eyes opened, large, wide. He kind of gasped back and looked at them and shook" when he identified them as his attackers. Zamora was then transported to the hospital.

Zamora testified at trial that he was a founding member of South Side Locos, a Sureño gang. They claimed the number 13 and the color blue. Border Brothers, a

9

Norteño gang, was their Oakland rival. Zamora had multiple gang tattoos, including "Sureño" and "SSL," and when he went to prison in 2000 he had "13" tattooed on the left side of his eye. He was imprisoned for four years, and after he was released, he tried to change his ways but kept returning to the gang life. He had the "13" tattoo removed from his face and the "SSL" tattoo removed from his arm.

In 2006, Zamora and other Sureños had been arrested for possession of a firearm, and he was jailed at Santa Rita, where he was housed in unit 21 with other Sureños and assigned to cell 1 in D pod. When he arrived, he recognized Contreras from having seen him at Santa Rita in 1999. He knew him by the nicknames "Nacho" and "Negro." Zamora also knew the mother of Contreras's child, and their children had played together. According to Zamora, when he arrived at Santa Rita Jail in 2006, Contreras recognized him and gave him a "head shake, like, hey, how you doing."

At breakfast on the morning of October 3, Zamora saw defendant, who went by the names "Killer" and "Terrorista." He had previously seen defendant at a party and at a flea market, where defendant gave him a "stare down . . . a mean mug." That morning, defendant gave Zamora the same "dirty look" he had given him at the flea market.

After breakfast, Zamora left the jail for a full day in court, returning to the pod around 7:00 p.m. Once back at D pod, he went straight to his cell and was talking to his cellmate. Shortly after, the cells were opened for pod time. Zamora was standing with his back to the cell door when he heard the door opening behind him. He glanced back to see defendant and Contreras come into the cell. Zamora turned his attention back to his cellmate, who suddenly said, "Trucha" (Spanish for "Watch out"). Zamora saw Contreras approach from behind, reach over Zamora's right shoulder, and slit the left side of his throat with a blue razor. Zamora grabbed his neck, felt hot liquid coming out, and saw a lot of blood. Defendant came towards him with a similar blue razor in his hand, and Zamora felt slices on his back, neck, stomach, and right temple.

Starting to feel dizzy, Zamora turned and began swinging his arm to defend himself. He noticed the cell door start to shut, and he believed he would die if he did not get out of the cell, so he shoved past defendant and Contreras and got out.

10

Once out of his cell, Zamora stumbled into the middle of the pod. Defendant and Contreras followed him and continued to attack him by kicking and swinging at him, with about six other inmates joining in. While he was being assaulted, inmates were saying, "Sur trece puto," which means "Sureño bitch." They were also yelling, "I'm a real Sureño."

Zamora made it to the intercom and was able to push the button. He was banging on the door to exit the pod. When it finally opened, he made it through, fell to the ground, and passed out. When he opened his eyes, he saw a deputy who was putting pressure on his neck and telling him to stay calm because he was losing a lot of blood. He started to pass out, but the deputy told him to focus on his child. Zamora thought he was going to die at that moment. He was asked if he would be able to identify the attackers, and when he said yes, he was shown cards of photographs. He identified "Killer" and "Negro" as his attackers.

Zamora was taken to the hospital, where he underwent surgery on a life-threatening laceration to his neck and a laceration to his head. He also had numerous other lacerations—including, in Zamora's estimation, 30 slashes on his back—that did not require sutures. According to his treating physician, the lacerations could have been caused by any sharp object if enough pressure was applied.

Zamora was interviewed on two separate occasions about the assault. In the first interview, a few hours after he arrived at the hospital, he identified Killer and Negro or Nacho as the attackers. He had been given painkillers when he arrived at the hospital, but at the time of the interviews, he was lucid. At the second interview, six days after the attack, he was shown several photographs. On one, he circled a photograph of defendant and wrote, "This is Ronnie AKA Killer, Terrorist. He is the one that got me in my right side of my head." He also circled a photograph of Contreras and wrote, "This is Nacho. He's the one that got me in my neck."

Zamora acknowledged that he had been a gang member from 2000 to 2009. During that time, he periodically attempted to leave the gang, but he kept returning. In 2000, he was convicted of misdemeanor battery and felony assault. In October 2006, he

11

was convicted of felony weapon possession, the crime that resulted in his incarceration at Santa Rita. In June 2010, he was convicted of a 2009 homicide. All of the convictions were gang related.

Alameda County Deputy Sheriff Colby Staysa testified that in October 2006, defendant and Contreras were both Sureños, and that Zamora was a Sureño but had attempted to distance himself from the gang. He further testified that Sureños oftentimes kill members who attempt to drop out of the gang.

### Defendant's Weapon Possession in Custody in 2008 (Count 13)

On March 26, 2008, two deputy sheriffs searched defendant's cell in the special handling housing unit (for inmates who are to have no physical contact with other inmates). Two items of contraband were found. One was a "shank," fabricated from six plastic bottles that had been sandwiched together, cut off at a sharp angle, and wrapped with the cardboard tubing from a toilet paper roll. The other was a razor blade that had been attached to the underside of a stool.

## PROCEDURAL BACKGROUND

A second amended information filed on June 29, 2011 charged defendant and Contreras with attempted premeditated murder and assault with a deadly weapon (counts 1 and 2), arising out of the October 3, 2006 assault on Zamora. Both charges were accompanied by allegations that each defendant personally inflicted great bodily injury and committed the offense to promote a criminal street gang. Defendant was additionally charged with assault with a firearm, shooting at an occupied motor vehicle, and permitting another to shoot from a vehicle (counts 3 through 5), arising out of the November 12, 2005 incident involving Mendoza; four counts of assault with a firearm and one count each of shooting at an occupied motor vehicle, kidnapping for ransom, and criminal threats (counts 6 through 12), arising out of the December 31, 2005 incident involving Acosta and his friends and all accompanied by personal use of a firearm and street gang enhancements; and custodial possession of a weapon (count 13), pertaining to the shank recovered from defendant's cell in 2008.

12

Evidence began on June 20, 2011 and was heard over the course of 10 days. The jury received the case on July 19 and deliberated for less than three days before finding defendant guilty as charged on all counts, except on count 10, on which it found him not guilty of shooting at an occupied motor vehicle but guilty of the lesser included charge of grossly discharging a firearm. It also found true all enhancements alleged.[3]

On June 21, 2013, the trial court denied defendant's motion for new trial and sentenced him to an indeterminate term of 18 years to life for the attempted murder offense and 20 years to life (consecutive) for the kidnapping for ransom offense, with a consecutive term of 33 years and four months for the remaining offenses and enhancements.

Defendant filed a timely notice of appeal.

## DISCUSSION

### A. The Trial Court Committed Prejudicial Error When It Instructed the Jury on Kidnapping for Ransom

Count 11 charged defendant with "KIDNAPPING FOR RANSOM, a violation of section 209(a) of the PENAL CODE of California, in that on or about December 31, 2005, . . . [defendant] did unlawfully seize, confine, inveigle, entice, decoy, abduct, conceal, kidnap, and carry away EDGAR ACOSTA with the intent to hold and detain, and who did hold and detain the said EDGAR ACOSTA for ransom, reward, extortion, and to exact from relatives and friends of said EDGAR ACOSTA money and other valuable things, to wit: LOCATION OF ANOTHER VICTIM." It has been said that because Penal Code section 209, subdivision (a)[4] "is phrased in the disjunctive, it describes four different types of aggravated kidnapping: (1) for ransom; (2) for reward; (3) to commit extortion; and (4) to exact from another person any money or valuable thing." (*People v. Ibrahim* (1993) 19 Cal.App.4th 1692, 1696.)

---

[3] The jury also found Contreras guilty on counts 1 and 2. He was sentenced to 18 years to life and appealed his convictions separately. (*People v. Contreras* (July 29, 2013, A135198) [nonpub.].)

[4] All subsequent statutory references are to the Penal Code.

The trial court read the jury CALJIC No. 9.53 (the instruction on section 209, subdivision (a)), as follows:

"Defendant Ronnie Padilla is accused in Count 11 of having violated section 209, subdivision (a) of the Penal Code, a crime.

"Every person who seizes, abducts, kidnaps or carries away another person by any means whatsoever with the specific intent to hold or detain that person for ransom, reward, or to commit extortion or to exact from another any money or valuable thing, is guilty of a violation of Penal Code section 209, a crime.

"In order to prove this crime, each of the following elements must be proved:

"1. A person was abducted or kidnapped or carried away;

"2. The abduction, kidnapping or carrying away of the person was without that person's consent; and

"3. The perpetrator of the abduction, kidnapping or carrying away had the specific intent to commit extortion or to obtain something of value from another." The instruction then went on to define consent, an issue not in dispute here.

Defendant contends this instruction was inadequate, because it failed to define extortion, a technical term the trial court had a sua sponte duty to define. This error, he argues, was prejudicial. The People offer no counterargument to defendant's claim that the instruction was inadequate, implicitly conceding the point. Indeed, this issue was squarely addressed in *People v. Hill* (1983) 141 Cal.App.3d 661, where the court generally observed, "It is well settled the trial court has no *sua sponte* duty to give amplifying instructions in the absence of a request if the terms used in the instructions given are 'commonly understood by those familiar with the English language'; while it does have such a duty where the term has a 'technical meaning peculiar to the law.' [Citation.]" (*Id.* at p. 668.) The court then considered whether a trial court is obligated to give an amplifying instruction on the word "extortion" as used in section 209, subdivision (a), holding that it is: "Ransom has no statutory definition. It appears in Penal Code section 209 and in Harbors and Navigation Code section 817. . . . The word is commonly understood by those familiar with the English language. . . . However, extortion is an

14

offense defined in Penal Code section 518 and is the subject of extensive CALJIC instructions (Nos. 14.70–14.79). While the word may be understood in a general sense, extortion as used in section 209 has a technical meaning peculiar to the law. The court should have instructed on the legal definition of extortion. [Citation.]"[5] (*People v. Hill*, *supra*, at p. 668.) It was thus error for the trial court here to fail to define the term extortion.

The question, then, is whether defendant was prejudiced by the instructional error. According to him, he suffered prejudice under the state prejudice standard of *People v. Watson* (1956) 46 Cal.2d 818 (whether there was a reasonable probability of a more favorable result but for the trial court's error) and the federal prejudice standard of *Chapman v. California* (1967) 386 U.S. 18 (whether the error was harmless beyond a reasonable doubt). He is correct.

As noted, CALJIC No. 9.53 instructed the jury that in order to find defendant guilty of violating section 209, subdivision (a), the prosecutor was required to prove that "The perpetrator of the abduction, kidnapping or carrying away had the specific intent to commit extortion or to obtain something of value from another." Had the jury been properly instructed, it would have been informed that extortion means "the obtaining of property from another, with his consent, . . . induced by a wrongful use of force or fear . . . ."[6] (§ 518.) Thus, in order to prove kidnapping for purposes of extortion, the prosecutor was required to prove that defendant kidnapped Acosta with the intent to obtain property from him.[7] Defendant contends there was no evidence he kidnapped

---

[5] The bench note to the CALCRIM instruction on section 209, subdivision (a) states: " 'Extortion' is defined in Penal Code section 518. If the kidnapping was for purposes of extortion, give one of the bracketed definitions of extortion *on request*." (CALCRIM No. 1202, emphasis added.) Curiously, for this proposition, it cites *People v. Hill, supra,* 141 Cal.App.3d at p. 668, despite its holding that the court has a sua sponte duty to define extortion.

[6] There was no suggestion defendant kidnapped Acosta for purposes of obtaining a ransom or reward.

[7] Although the language in section 518 states "property from another"— suggesting an intent to obtain property from someone other than the victim of the

15

Acosta in order to obtain property from him, so if the jury had been properly instructed, it would have acquitted him on count 11. We agree.

*People v. Kozlowski* (2002) 96 Cal.App.4th 853 (*Kozlowski*) offers the most instructive analysis of what constitutes property for purposes of extortion. In that case, defendants were convicted of two counts of kidnapping for purposes of extortion (among numerous other charges) based on evidence they kidnapped two girls, obtained their personal identification numbers (PIN) for their ATM cards at gun- and knife-point, and withdrew money from one victim's bank account using her ATM card. (*Id.* at pp. 856–858.) They challenged their convictions on multiple grounds, including that as a matter of law a PIN is not property that may be extorted. (*Id*. at pp. 856, 864.)

Noting that this was a question of first impression, the court began its analysis with a series of general concepts, the first being that the Penal Code's definition of property did not exclude a PIN, because "property" is defined as including "real and personal property," and "personal property" as including, but not being expressly limited to, "money, goods, chattels, things in action, and evidences of debt." (*Kozlowski, supra,* 96 Cal.App.4th at p. 865, quoting § 7, subds. (10), (12).) It also recognized that as used in California's extortion statute, the "term 'property' . . . should be *broadly* interpreted." (*Ibid.*, citing 2 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Crimes Against Property, § 104, p. 137; see also *Kozlowski,* at p. 866 ["The term is all-embracing, including every intangible benefit and prerogative susceptible of possession or disposition."].) Further, according to the court, the crime of extortion is related to the offense of robbery such that cases involving robbery and other larceny offenses were instructive. As such, it noted that "[c]ases and statutes define the term 'property' in the context of theft-based offenses as the exclusive right to use or possess a thing or the exclusive ownership of a thing." (*Ibid.*)

extortion—courts have held that "[t]he crime of extortion (Pen. Code, § 518) does not require that the fruits of the extortion be obtained from a third party." (*People v. Ibrahim, supra,* 19 Cal.App.4th at p. 1696; but see *People v. Macinnes* (1973) 30 Cal.App.3d 838 [suggesting that kidnapping for purposes of extortion requires proof that the kidnapper sought to obtain property from someone other than the victim].)

16

The court also looked to *People v. Kwok* (1998) 63 Cal.App.4th 1236 (*Kwok*) for guidance. (*Kozlowski, supra,* 96 Cal.App.4th at p. 868.) *Kwok* involved a residential burglary where defendant entered the victim's garage, removed a lock to the door between the garage and the house, took it to a locksmith to have a key made, returned the lock to its rightful place, and later used the key to enter the house and assault the victim. (*Id.* at pp. 1240–1245.) On appeal, defendant argued there was insufficient evidence of an intent to commit a theft or felony at the time of entry because he had no intent to permanently deprive his victim of her lock, and making and retaining an unauthorized key did not constitute theft. (*Id.* at pp. 1248–1249.) The Court of Appeal disagreed, reasoning that the key was property, and defendant's unauthorized possession of the key deprived the victim of something valuable: her right to exclusive access to her home. (*Id.* at p. 1251.)

With these principles in mind, the *Kozlowski* court concluded that a PIN is property for purposes of extortion. It reasoned as follows: "We may take judicial notice of the common knowledge that a PIN code is more valuable if not disclosed to others— or, put another way, if it is exclusively possessed. [Citation.] In like manner, the means to bank account access is an intangible benefit susceptible of possession. [Citation.] Thus, it may reasonably be said that a PIN code is property because it implies the right to use that access code—and to access the funds in the related bank account by means of that code. [Citation.] Operating as it does as a means of account access, a PIN code can be characterized as intangible property. [Citation.]" (*Kozlowski, supra,* 96 Cal.App.4th at p. 867.) Put another way, when defendants compelled their victims to reveal their PINs, "that knowledge destroyed the intangible benefit of being able to control access to the bank accounts. The intangible property taken—the PIN codes—were the means to obtain the more tangible property—the bank funds—contained in those accounts." (*Id.* at p. 869.) In light of this, the court concluded that a PIN constitutes property for purposes of kidnapping for extortion. (*Ibid.*)

More recently, in *People v. Fisher* (2013) 216 Cal.App.4th 212, defendant challenged his conviction for delivering a letter with intent to extort money or other

17

property in violation of section 523. The evidence established that defendant had delivered to a prospective employer a letter demanding minimum wage for a job accompanied by a threat that if not given the job he would show up at the company "armed" with a piece of sandpaper (similar to what he had used on a prior occasion to sand paint off a car, leading to a vandalism conviction). (*Fisher, supra,* 216 Cal.App.4th at pp. 214–215.) The Court of Appeal rejected defendant's argument that there was insufficient evidence he delivered a letter with intent to extort because his demand for a job was not a demand for money or property. After discussing *Kozlowski* and *Kwok* (and a New York case, *People v. Spatarella* (1974) 34 N.Y.2d 157), the court explained, "Here, defendant did not apply for a job in the normal course and allow the employer to evaluate his application when a job became available. Defendant demanded to be employed by the business owner or face vandalism to vehicles at the business. Defendant's threat to be employed or subject the business to vandalism was a demand for part of the employer's business, i.e., part of the intangible benefit and prerogative of being able to control whom to employ in one's business." (*Fisher, supra,* at pp. 218–219.) It then concluded that "property for purposes of the extortion statute includes a business owner's right to determine whom to employ," and thus upheld defendant's conviction. (*Ibid.*)

These cases all recognize that property for purposes of extortion need not be a tangible item; they upheld convictions where defendants wrongfully obtained (or sought to obtain) intangible property. But, significantly for our purposes, they also recognized that fundamental to the concept of property is the victim's right to exclusively possess the property. Here, the evidence established that defendant kidnapped Acosta for purposes of obtaining information regarding Bueso's whereabouts. It cannot be said that Acosta had the right to exclusive use or possession of that information. We thus conclude that under the circumstances here, information regarding another's whereabouts does not constitute property within the meaning of kidnapping for purposes of ransom. This, in turn, leads us to the conclusion that had the jury been properly instructed, it would have found defendant not guilty of aggravated kidnapping.

18

The People acknowledge that the term "property" in the context of theft-based offenses requires the exclusive right to use or possess a thing or the exclusive ownership of a thing having some intrinsic value. They then make this puzzling argument: "Contrary to appellant's assertion, 'exclusive,' used in this context, means exclusive to the rest of the world, including appellant. It does not mean that a person is necessarily the only one who has a right to use or possess the 'thing.' " This curious contention aside, the People also submit that defendant "forcing Acosta to use his cell phone and information stored in the phone, constituted the taking of intangible property, for the purpose of obtaining tangible property, Bueso's person and possibly his life." We fail to see how this theory fits into the concepts set forth in *Kozlowski*, *Kwok*, and *Fisher*. As explained above, information regarding someone's whereabouts does not fit into the concept of intangible property. And the People provide no support for their theory that "Bueso's person and possibly his life" are tangible property.

Finally, the People contend that even if information regarding Bueso's whereabouts did not constitute property for purposes of extortion, defendant was still not prejudiced by the lack of instruction defining "extortion" because there was substantial evidence that defendant kidnapped Acosta "to exact from another person any money or valuable thing," the fourth type of aggravated kidnapping identified in *People v. Ibrahim, supra,* 19 Cal.App.4th at p. 1696. As the People would have it, "The evidence here also shows that appellant kidnapped Acosta to exact from another, Bueso, a 'valuable thing;' his person and his life. Such evidence clearly falls under the fourth category of the aggravated kidnapping statute." They cite no authority, however, supporting their creative suggestion that taking Bueso's "person" or "life"—e.g., murdering him—is exacting a "valuable thing" from him within the meaning of section 209, subdivision (a). We further note that the information alleged the "valuable thing" to be the "LOCATION OF ANOTHER VICTIM" (presumably, Bueso), which defendant allegedly sought to "exact from relatives and friends of said EDGAR ACOSTA . . . ." No evidence supported this allegation.

19

In light of the foregoing, we cannot say that the trial court's failure to define "extortion" for the jury was harmless error. Reversal on count 11 is thus required.

**B. Defendant Did Not Receive Ineffective Assistance of Counsel as a Result of His Counsel's Failure to Move for Severance of the Non-Gang Charges from the Gang Charges and to Oppose Consolidation of the Custodial Weapon Possession Charge**

**1. Background**

In early 2006, defendant was charged with five crimes arising out of the December 31, 2005 incident involving Acosta and his friends. In March of that year, the district attorney sought to amend the complaint to add three charges arising out of the November 12, 2005 incident involving Mendoza. Over defendant's demurrer and objection, the court granted the motion.

On July 7, 2006, following a preliminary hearing, the district attorney filed an information charging defendant with five counts of assault with a firearm, and one count each of shooting at an occupied motor vehicle, permitting another to shoot from a vehicle, kidnapping for ransom, and criminal threats. The first three charges arose out of the November 12 incident, the remaining six out of the December 31 incident. Only the charges arising out of the December 31 incident were accompanied by criminal street gang allegations.

A complaint filed on October 18, 2006 charged defendant and Contreras with attempted murder and assault by means likely to produce great bodily injury, both charges arising out of the assault on Zamora and both accompanied by gang allegations. An information asserting the same charges followed on March 25, 2008.

On May 7, 2008, the district attorney moved to consolidate the charges arising out of the assault on Zamora with the previously joined charges against defendant arising out of the November 12 and December 31, 2005 incidents. Counsel for codefendant Contreras opposed the motion, but counsel for defendant did not, submitting on the motion instead. The trial court granted the motion.

On March 27, 2009, the district attorney filed an information charging defendant with custodial possession of a weapon. No gang enhancements were alleged. In May,

20

the district attorney moved to consolidate this charge with the other, previously consolidated charges. Defendant's counsel did not file written opposition to the motion. At the July 24, 2009 hearing on the motion, the trial court asked defendant's counsel if he wanted to be heard. Counsel replied, "No, your Honor. I spoke with my client. I don't think he has any objection." The trial court granted the motion.

On May 31, 2011, Contreras filed a motion to sever the October 3, 2006 charges (the assault on Zamora) from all other charges. Defendant's counsel did not join in the motion on defendant's behalf, or bring his own motion to sever.[8] The trial court denied Contreras's motion.

Defendant now contends his counsel provided ineffective assistance by failing to move for severance of the non-gang related charges (the November 12, 2005 incident) from the gang related charges (the December 31, 2005 and October 3, 2006 incidents) and for failing to oppose the prosecutor's motion to join the 2008 custodial weapon possession charge. Defendant's contentions lack merit.

### 2. The Law Governing Ineffective Assistance of Counsel Claims and Consolidation of Charges

In *People v. Mackey* (2015) 233 Cal.App.4th 32, 119, we recently summarized the well-established standard for a successful ineffective assistance of counsel claim: "A defendant claiming ineffective assistance of counsel must demonstrate both deficient performance and resulting prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 687, 691–692 (*Strickland*); *People v. Ledesma* (1987) 43 Cal.3d 171, 216–218.) On the first prong he must show that 'counsel's representation fell below an objective standard of reasonableness . . . [¶] . . . under prevailing professional norms.' (*Strickland, supra,* at p. 688.) And under the second, he must show that in the absence of the error it is reasonably probable that a result more favorable to him would have been obtained. A reasonable probability is 'a probability sufficient to undermine confidence in the

---

[8] Post-verdict, defendant brought a motion for new trial. At the hearing on the motion, the trial court stated that defendant's counsel had orally joined in Contreras's motion to sever. Nothing in the reporter's transcript of the June 7, 2011 hearing on Contreras's severance motion suggests such a joinder.

outcome.' (*Id.* at p. 694.)" Where defendant fails to show prejudice, we may reject a claim of ineffective assistance of counsel without reaching the issue of deficient performance. (*Id.* at p. 697.)

Penal Code section 954 provides for the consolidation of charges under specific circumstances spelled out therein: "An accusatory pleading may charge two or more different offenses connected together in their commission, . . . [or] different offenses of the same class of crimes or offenses, under separate counts . . . [p]rovided, that the court . . . in the interests of justice and for good cause shown, may in its discretion order that the different offenses or counts . . . be tried separately . . . ." (See also *People v. Koontz* (2002) 27 Cal.4th 1041, 1074 ["An accusatory pleading may charge two or more different offenses connected together in their commission, or two or more different offenses of the same class of crimes. (§ 954.) Offenses falling within this description, but charged in separate pleadings, may be consolidated for trial in order to promote judicial efficiency . . . ."].)

### 3. Defendant Cannot Demonstrate Prejudice

We need not address the first prong of defendant's ineffective assistance of counsel claim—e.g., whether defendant's counsel should have sought to have the non-gang and weapon possession charges tried separately and whether such an effort would have been successful—because defendant has not demonstrated prejudice. (*Strickland, supra,* 466 U.S. at pp. 687–691.) In other words, even assuming without deciding that defendant's counsel's conduct in failing to oppose joinder fell below an objective standard of reasonableness, and further assuming that the trial court abused its discretion in granting the prosecution's consolidation motions (and denying Contreras's severance motion), defendant would still not prevail on his ineffective assistance of counsel claim because he has not demonstrated a reasonable probability of a more favorable result had the charges been tried separately. This is so because each set of charges, standing alone, was supported by overwhelming evidence.

Turning first to the trial of the non-gang charges (the November 12, 2005 incident) with the gang charges (the December 31, 2005 and October 3, 2006 incidents), defendant

22

contends "the prosecutor placed the November 12, 2005 charges, although not charged as gang crimes, squarely within the context of a nightmarish, dystopian gang world." As defendant would have it, the prosecutor's opening statement described "the dark underworld of gangs" in which defendant and Contreras existed. He told the jury that defendant was a long-time and high-ranking South Side Locos member, had the gang monikers "Killer" and "Terrorista," and was "a drug supplier to the East Oakland Sureños." He told the jury about the violence committed by gang members, who were "all about fear and intimidation." And, despite that the November 12, 2005 charges were not charged with gang enhancements, the prosecutor described them as gang charges during the opening statement, treated them as such throughout the trial, and argued in closing that although they were not charged as gang charges, "we certainly could have made that argument." This, according to defendant, "infuse[d] the November 12 charges with a gang taint." Further, according to defendant, had the non-gang charges been tried separately, they would not have been infused with "all of the graphic and disturbing substantive (i.e., non-gang) evidence regarding the December 31, 2005 and October 3, 2006 incidents." But had counts 3 through 5 been tried alone, there was abundant evidence of defendant's guilt, such that it cannot be said that a more favorable result was reasonably probable.

Counts 3 through 5 charged defendant with assault with a firearm,[9] shooting at an occupied vehicle,[10] and permitting another to shoot from a vehicle,[11] respectively.[12]

---

[9] Count 3, assault with a firearm (§ 245, subd. (a)(2)), required the prosecutor to prove that defendant assaulted a person and that the assault was committed with a firearm.

[10] Count 4, shooting at an occupied vehicle (§ 246), occurs when a person willfully, unlawfully, and maliciously discharges a firearm at an occupied vehicle.

[11] Count 5, permitting another to discharge a firearm from the vehicle (§ 12034(b)) consists of the following elements: one, a person within a motor vehicle other than the owner or driver discharged a firearm; and two, the driver of the vehicle knowingly permitted the other person to discharge the firearm.

[12] The prosecutor's theory on counts 3 and 4 was that defendant aided and abetted the shooter through his driving conduct.

23

Mendoza's testimony alone was enough to convict defendant on those charges. He testified that the car that chased him on November 12 was the same one he encountered on International Boulevard in the earlier incident. He got a look at defendant in the earlier incident, and on November 12, he saw the same person driving the Pontiac. At trial, he identified defendant as the driver. He told the police that the driver's name might be Ronnie. Both Mendoza and Cabrera testified that a passenger in the car fired upon Mendoza's car. The police report contained the suspect car's license plate number, and the plate was registered to an individual with the same address as defendant. And, ultimately, defendant's identity as the driver in the November 12 incident was not even in dispute, because defense counsel conceded defendant was the driver. In light of this evidence, we are unpersuaded by defendant's claim of "a reasonable probability that, if there had been a separate trial on the November 12, 2005 incident charges, [defendant's] trial counsel—unburdened by the voluminous, blinding and prejudicial prosecution gang evidence—would have more effectively defended those charges such that the jury would have maintained a reasonable doubt about them."

Defendant also contends that joining the November 12, 2005 charges with the December 31, 2005 charges compromised his ability to defend against the December 31, 2005 charges. This is so, he reasons, because by allowing the prosecutor to prosecute the November 12 charges as if they were gang-related, and thus lacking in a personal motivation, the jury was likely to infer that there was a lack of personal motivation, and thus a gang motivation, with respect to the December 31 charges. But no inference was needed to prove that the December 31 incident had a gang connection, as there was actual evidence that the incident was gang-related, including Acosta's and Duran's testimony that occupants of the blue car threw gang signs at them and said "South Side Locos," Ruelas's testimony that defendant flashed a '3' sign, and defendant's statement to the police that that Bueso "thr[e]w up the '4'," for Norte, so he responded by "throwing '3' " for "Sureño, Southside, 13."

Defendant also contends that joining the November 12, 2005 charges with the December 31, 2005 charges prejudiced his defense of the December 31, 2005 charges

24

because it undermined his self-defense claim (that he shot at Bueso's car only after its occupants fired upon him first). This was so, he submits, because there was no claim of self-defense with respect to the November 12 incident. Defendant's self-serving statement to the police that he fired at Bueso's car only after Bueso fired at him lacked any physical evidence (such as bullet holes in his car) corroborating this claim, and was, quite simply, unconvincing in light of the testimony by the occupants of the car, who denied it occurred. This would be true with or without evidence of the November 12 incident.

Lastly, we turn to defendant's claim that the failure of his counsel to oppose joinder of the weapon possession charge (count 13) constituted ineffective assistance of counsel. Again, we conclude that defendant has not demonstrated a reasonable probability of a more favorable result had the charges been tried separately.

Defendant contends that joinder of count 13 with the attempted murder charge (count 1) highly prejudiced his defense on the attempted murder charge. He does not deny he was one of the inmates who assaulted Zamora with his fists, but he argues there was reasonable doubt whether he was one of the two assailants who slashed Zamora with a razor blade. In fact, he contends that there was "strong evidentiary support" to the contrary, in that Zamora was the only witness who placed a razor blade in his hand, with all other witnesses testifying only that they saw defendant assaulting Zamora with his hands. Defendant argues that Zamora had "tremendous credibility problems," given his "history of lying to people, including police officers", his history as a gang member, and his criminal history. Defendant also claims the reliability of Zamora's testimony was further weakened by the fact that he was dizzy and lapsing in and out of consciousness when he identified defendant as one of the two attackers and by the absence of razor-like slashes on his back consistent with what Zamora said defendant had done to his back. Defendant then concludes, "In light of this state of the evidence regarding the October 3, 2006 incident, the definitive placement of a prohibited razor blade in appellant's sole possession, while housed in a one man cell, which was provided by the uncontested

25

joinder of the 2008 custodial weapon possession, filled a crucial gap in the prosecution's count 1 premeditated and deliberated attempted murder case."

But disregarding the evidence on the weapon possession charge, there was overwhelming evidence of defendant's guilt on the attempted murder charge, from Zamora's unequivocal identification in the immediate aftermath of the assault of defendant as one of his two attackers; his identification of defendant a few hours after the assault; his identification six days later of a photo of defendant on which he wrote, "This is Ronnie AKA Killer, Terrorist. He is the one that got me in my right side of my head"; and his testimony at trial in which he described how defendant came into his cell with Contreras, and sliced his back, neck, stomach, and forehead with a razor blade.

## DISPOSITION

Defendant's conviction on count 11 is reversed. In all other regards, the judgment of conviction is affirmed.

_____

Richman, J.

We concur:


_____

Kline, P.J.


_____

Stewart, J.


A139259; *People v. Padilla*


27