Filed 10/28/21  P. v. Singh CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C088997 |
| Plaintiff and Respondent, | (Super. Ct. No. 16FE018212 ) |
| v. | |
| HARPREET SINGH, | |
| Defendant and Appellant. | |

Is testifying as a complaining witness in a criminal prosecution a form of property, as defined in the context of kidnapping for extortion?  The prosecution argued, and the trial court agreed, that defendant Harpreet Singh could be convicted of aggravated kidnapping under a kidnapping for extortion theory because the reason for the kidnapping, preventing the victim from testifying against him in a sexual assault prosecution, was a form of property as defined in the extortion statute (former Pen. Code,

1

§ 518).[1]  They are wrong.  Although the term "property" is broadly defined in the context of the extortion statute, it is not this broad.  The ability to testify is not property.

Following a jury trial, defendant was convicted of assault with the intent to commit sexual penetration by force (§ 220, subd. (a)), conspiracy to dissuade a witness (§ 182, subd. (a)(1)), dissuading a witness (§ 136.1, subd. (c)(1)), and aggravated kidnapping (§ 209, subd. (a)), with on bail enhancements (§ 12022.1); defendant admitted a serious felony (§ 667, subd. (a)), and strike allegations as well (§§ 667, subds. (b)-(i), 1170.12).    He was sentenced to 14 years to life plus 20 years.

On appeal, defendant contends there were multiple instructional errors on the assault offense, the aggravated kidnapping conviction must be reversed as it was obtained under an invalid theory, the trial court prejudicially erred in failing to instruct on simple kidnapping as a lesser included offense, and the trial court should have instructed on the definition of property.

Insufficient evidence supports the aggravated kidnapping conviction because testifying is not a form of property, and defendant could be guilty of aggravated kidnapping only if testifying was a form of property.  Since simple kidnapping is a lesser included offense of aggravated kidnapping in this case under the accusatory pleading test, we shall modify the aggravated kidnapping conviction to simple kidnapping.  Declining to reach the remaining contentions regarding the kidnapping count and rejecting the contention regarding the assault count, we shall modify the conviction and remand for resentencing.

---

[1]  Undesignated statutory references are to the Penal Code.

FACTUAL AND PROCEDURAL BACKGROUND

*Prosecution Case*

A.     *The Sexual Assault*

M.D. and defendant had been dating for about a month in July 2016.  He had told M.D. he was once accused of rape.

According to M.D., on July 5, 2016, at around 2:00 a.m., she went to defendant's Elk Grove home to spend time with him and talk about their relationship.  An engagement party for defendant's brother was ending; when she arrived, someone offered her a drink and she accepted.  She and the others socialized and drank.  At some point, defendant asked her to go upstairs after she started feeling dizzy and wanted to go outside.

When they got upstairs, M.D. took off some of her clothes and they started kissing on defendant's bed.  She was not going to have sex with defendant that night because she was menstruating and M.D. believed defendant had sex with other women during a recent trip to Las Vegas.  Defendant touched her vagina; she told him to stop and pushed defendant away.  He did not comply at first, but he eventually let her use the bathroom.  He was asleep when she returned.

M.D. was upset because she had come over to defendant's to talk with him, so she tried to wake defendant by kissing and moving him.  Defendant muttered another woman's name when he awoke, which upset M.D.  She and defendant started to wrestle, playfully at first until defendant grabbed her wrists and pushed M.D. onto the bed.  An angry looking defendant pinned her arms above her head and threatened, "I will fuck you up, nigga."  Scared, M.D. tried but failed to get away from defendant.  He removed her remaining clothing while ignoring M.D.'s repeated pleas for him to stop.  According to M.D., she tried to push defendant away but he penetrated her vagina with his penis three to four times.  Still angry, defendant slapped M.D. in the face and called her a "dirty bitch."

3

M.D. could do no more than turn her body around as she tried to get away from defendant. He started pulling M.D.'s hair, then put something into her anus several times. After M.D. got on her back, defendant started to choke her. He laid down on the bed after he stopped the assault.

M.D. cried and pounded on defendant's chest. Defendant went to her side and apologized but got angry when she refused to calm down. He told M.D. she should calm down or leave. Being too intoxicated to drive and unable to find a ride home, M.D. slept in defendant's bed.

At 9:00 a.m. that morning, defendant told M.D. to get dressed while he confirmed that his parents were not home. After she left, defendant sent M.D. a text thanking her for coming over. M.D. replied by texting defendant that he was a "fucking psycho" who put his hands on her. Later that day, she texted her friends that she fought with defendant because he wanted to have sex and she did not. She also texted her friends that defendant had "slapped" her a few times, had pulled her hair, scared her, and acted like a "fucking psycho." She told them that she had to do "the hardest thing," sleeping at his house that night, because she could not find a ride home.

M.D. reported the sexual assault to the Elk Grove Police that afternoon. Police Officer Jason Skelton interviewed her and saw a bruise on her left forearm, where she reported feeling pain. M.D. also complained of pain in her neck, but Officer Skelton saw no marks. She told Officer Skelton she was on her period, had removed one tampon, and inserted another.

M.D. had a sexual assault examination that day, during which she told Dr. Angela Vickers that defendant had penetrated her anus with his finger. Dr. Vickers found evidence of anal tears, several cuts to M.D.'s inner vagina, and that two tampons were in her vagina. No semen was found in swabs taken from her vulva, vagina, cervix, or the tampons.

4

Swabs taken from both sides of M.D.'s neck contained DNA that was consistent with defendant's. DNA from her right breast had a profile that was highly likely defendants.

In a later interview with Elk Grove Police, M.D. said defendant penetrated her vagina and anus with his finger while her hair was being pulled. The penetration of her vagina began before the "playful wrestling" started.

B.     *Kidnapping and Dissuading a Witness*

On October 23, 2017, a week before defendant's trial was scheduled to start, a man and a woman approached M.D. as she got out of her car by her apartment.   The man yelled at M.D.; he pointed a gun at her head as she turned around. The man grabbed M.D.'s arm, told her to shut up, and pushed her into a car that was driven by a third person. Inside the car, the woman, Jaswin Kaur,[2] told M.D. that defendant had sent them. Kaur said they had been following her for a year, knew where she worked, and where her daughter went to school; they knew her every move. M.D. was scared when Kaur told her the name of her daughter's daycare, the store where she worked, and the gym she used.

Kaur told M.D. testifying against the defendant was wrong because he was innocent. She told M.D. not to appear in court. M.D. was to contact a defense investigator, Angela Santos, the following day and recant the allegations she made against defendant. M.D., who believed she was being recorded, was made to repeat statements to the effect that no sexual assault took place. Kaur told M.D. defendant wanted to contact her and would contact her the next day about arranging a meeting. The kidnappers then drove back to M.D.'s apartment and dropped her off.

---

[2]  Kaur and defendant filed for a marriage license on June 20, 2017.

M.D. stayed home from work the following day. She called Investigator Santos and left a message to call back. She then went to the store, where Kaur called and told M.D. she knew where she was and that she should call Kaur after talking with Santos. Santos later called, and M.D. gave a recorded statement recanting her allegations against defendant. She then called Kaur and related what she told Santos.

That evening, M.D. talked on the phone with defendant, who said he was frustrated with the case and how much money he spent on it. They agreed to meet at a park near M.D.'s apartment and did so the next day. When they met, defendant hugged and caressed M.D., searched her for a wire, and told her everything would be all right. After defendant again vented about his situation and his belief that the sexual assault never happened, M.D. expressed her sympathy because she felt she had to. Defendant said nothing would happen to M.D. if she did not show up to testify, and she would get a paid vacation for herself and her daughter if this happened. He also told M.D. the case would be dropped if she did not show up. After defendant made sexual advances towards her, M.D. became uncomfortable and thought up a reason to leave.

The next day, October 26, 2017, M.D. drove to Fairfield to see a friend. Kaur repeatedly called her that day, but M.D. ignored the calls. The following day, October 27,2017, Kaur texted M.D. to call her back. When she did so, Kaur told M.D. she was upset, M.D. should answer her calls, and that she knew M.D. had gone to Fairfield. M.D. wondered whether she was being followed. On October 28, 2017, M.D. looked under her car and found what was later identified as a GPS tracker. This caused M.D. to decide to testify at defendant's trial. She called the Elk Grove Police and gave an initial statement, and later spoke with a detective, who told her the device was a GPS tracker, which police eventually recovered.

M.D. gave an extensive statement to the Elk Grove Police on October 29, 2017, after which she participated in four pretext calls, two with Kaur, and two with defendant. During one call, defendant complaint he would get 40 years for something he did not do.

6

He told M.D. he was in charge and in control of the situation, the tracker had been on M.D.'s car for a while, and nothing would happen to her if she listened to him. In the other pretext call, defendant told M.D. that she was being tracked only so the case would drop, he had control of the situation but would lose it if M.D. did not listen, and her doing something stupid would "fuck you up." Kaur told M.D. in one call that "he" had asked her to call M.D., they had been tracking her for about a year and would continue until the entire trial was dropped. Kaur also told M.D. nothing would happen to her or her daughter if the case was dropped, and they could have taken care of the problem, but "he" did not want to do that.

Defendant was arrested after the pretext calls. Elk Grove Police seized six cell phones from defendant's truck when executing a search warrant. In a call from jail with a woman named Jas, defendant told the woman to turn off her phone and the woman told defendant she had no money and could not book a ticket to India. About a week later, he made a call to a phone linked to Kaur, the two engaged in a highly emotional conversation during which they each expressed their love for the other.

C.     *Prior Misconduct*

On April 23, 2010, D.D. met defendant at a friend's barbecue. She did not feel well after a few drinks while at the barbecue and went to a guest bedroom to sleep. D.D. awakened to find defendant on top of her; he was pinning her arms down and his face was very close to hers. Defendant had removed her pants and underwear, and his penis was inside her vagina. A hysterical D.D. scratched defendant's face and kicked him as she tried to escape. Defendant kept thrusting his penis into her vagina. When she escaped, D.D. left the bedroom and sought help.

D.     *Defense Evidence*

Officer Skelton took M.D.'s statement and asked whether she resisted defendant taking off her bodysuit. M.D. told the officer she did not say no to the defendant because she thought he was trying to make her feel comfortable.

7

Heath Newland, defendant's friend, and a former employee of the towing business owned by defendant's family, attended the July 4 and 5, 2016 gathering at defendant's home, which followed an engagement party for defendant's brother. Newland testified that M.D. arrived at the gathering around 1:30 a.m.; she was nicely dressed and looked "hot." She sat next to defendant on the couch, held his hand, and was very flirtatious with defendant. Newland saw M.D. have two drinks.[3] After he went to bed in a guest bedroom, Newland was awakened by defendant a little after 4:00 a.m. He went upstairs to defendant's bedroom, where he saw M.D. sitting on defendant's bed, looking like she just had sex. M.D. declined his offer of a ride home. He admitted to previously stating M.D. looked like she had been crying.

Dr. Jerrold Kram, an expert on sleep medicine, testified about the sleep disorder parasomnia, a condition where the subject engages in various activities like going downstairs, cooking and eating, and then returning to bed, without remembering having done so. Alcohol can contribute to the deep sleep state during which this can occur.

Ashley Cuevas met defendant at the end of 2014 and dated him for around six months. They had sex during this time; defendant never forced her to engage in any sexual activity, even when they had sex after drinking alcohol. She continued the relationship after defendant told her he had been convicted of rape.

DISCUSSION

I

*Instructional Error*

Defendant contends the trial court prejudicially erred in failing to adequately instruct on the specific intent element of the section 220 offense of assault with intent to

---

[3] Newland also saw defendant drink that day, "normally for a party of that caliber;" but he did not think defendant was drunk or "sloppy drunk," but maybe "buzzed."

8

commit sexual penetration by force, and by failing to instruct on voluntary intoxication and unreasonable belief M.D. consented to the penetration.

A.     *Background*

Regarding the sexual assault of M.D., defendant was charged with rape (§ 261, subd. (a)(2)) in count one and forcible sexual penetration (§ 289, subd. (a)(1)) in counts two and three.  He was acquitted of the charge and the lesser included offense on count one, acquitted on count two, with the jury unable to reach a verdict on the lesser included offense, and acquitted on count three, but convicted of assault with intent to commit sexual penetration as a lesser included offense.

Over the prosecutor's objection, the trial court ruled that the jury would be instructed on the rape and forcible sexual penetration charges that defendant was not guilty if he actually and reasonably believed M.D. consented.  Over defendant's objection, the trial court also gave a pinpoint instruction that such belief could not be reasonable unless supported by circumstances other than voluntary intoxication.  The trial court further ruled the reasonable belief in consent instruction was inapplicable to the lesser included offense of assault with intent to commit sexual penetration because this charge alleged conduct to which M.D. could not consent.  Defense counsel agreed with this ruling.

The trial court gave the standard jury charge on assault with intent to commit sexual penetration by force, CALCRIM No. 890 as follows:

"Assault with intent to commit a sexual penetration by force, in violation of Penal Code section 220, is a lesser offense of sexual penetration by force charged in Counts 2 and 3.

"To prove that the defendant is guilty of this crime, the People must prove that:

"1.  The defendant did an act that by its nature would directly and probably result in the application of force to a person;

"2.  The defendant did that act willfully;

9

"3.  When the defendant acted, he/[she] was aware of facts that would lead a reasonable person to realize that his/[her] act by its nature would directly and probably result in the application of force to someone;

"4.  When the defendant acted, he/[she] had the present ability to apply force to a person;

"[AND]

"5.  When the defendant acted, he/[she] intended to commit sexual penetration by force.

"Someone commits an act *willfully* when he or she does it willingly or on purpose.

"The terms *application of force* and *apply force* mean to touch in a harmful or offensive manner.  The slightest touching can be enough if it is done in a rude or angry way.  Making contact with another person, including through his or her clothing, is enough.  The touching does not have to cause pain or injury of any kind.

"The touching can be done indirectly by causing an object to touch the other person.

"The People are not required to prove that the defendant actually touched someone.

"No one needs to actually have been injured by the defendant's act. But if someone was injured, you may consider that fact, along with all the other evidence, in deciding whether the defendant committed an assault, and if so, what kind of assault it was.

"To decide if defendant intended to commit a sexual penetration by force please refer to Instruction 1045 which defines that crime."

The court instructed on the sexual penetration by force charges in counts two and three with CALCRIM No. 1045, which stated as follows:

"The defendant is charged [in Count ] with sexual penetration by force in violation of Penal Code section 289.

10

"To prove that the defendant is guilty of this crime, the People must prove that:

"1. The defendant committed an act of sexual penetration with another person;

"2. The penetration was accomplished by using a foreign object, or an unknown object;

"3. The other person did not consent to the act;

"AND

"4. The defendant accomplished the act:

"by force, violence, duress, menace, or fear of immediate and unlawful bodily injury to another person.

"*Sexual penetration* means penetration, however slight, of the genital or anal opening of the other person for the purpose of sexual abuse, arousal, or gratification.

"A *foreign object*, *substance*, *instrument*, or *device* includes any part of the body except a sexual organ. An *unknown object* includes any foreign object, substance, instrument, or device, or any part of the body, including a penis, if it is not known what object penetrated the opening.

"Penetration for *sexual abuse* means penetration for the purpose of causing pain, injury, or discomfort.

"In order to *consent*, a person must act freely and voluntarily and know the nature of the act.

"Evidence that the defendant and the other person dated is not enough by itself to constitute consent.

"An act is *accomplished by force* if a person uses enough physical force to overcome the other person's will.

"*Duress* means a direct or implied threat of force, violence, danger, hardship, or retribution that is enough to cause a reasonable person of ordinary sensitivity to do or submit to something that he or she would not otherwise do or submit to. When deciding

11

whether the act was accomplished by duress, consider all the circumstances, including the age of the other person and her relationship to the defendant.

"*Retribution* is a form of payback or revenge.

"*Menace* means a threat, statement, or act showing an intent to injure someone.

"An act is *accomplished by fear* if the other person is actually and reasonably afraid.

"The defendant is not guilty of forcible sexual penetration if he/[she] actually and reasonably believed that the woman consented to the sexual penetration and actually and reasonably believed that she consented throughout the act of sexual penetration. However, if as a result of self-induced intoxication, the defendant believed the female was consenting, that belief would not thereby become either reasonable or in good faith unless from all the surrounding circumstances other than self-induced intoxication you should find that defendant's belief that the female was consenting was reasonable and in good faith. The People have the burden of proving beyond a reasonable doubt that the defendant did not actually and reasonably believe that the woman consented. If the People have not met this burden, you must find the defendant not guilty."

*B.      Intent and Consent*

Defendant's primary claim of error is that the trial court erred by failing to instruct on the section 220 offense element of specific intent.

A trial court has a sua sponte duty to instruct the jury on the essential elements of an offense (*People v. Flood* (1998) 18 Cal.4th 470, 480), and on the general principles of law governing the case, which include those principles of law closely and openly connected with the facts of the case and necessary to the jury's understanding of the case. (*People v. Michaels* (2002) 28 Cal.4th 486, 529-530.) "A 'criminal defendant is entitled to adequate instructions on the defense theory of the case' if supported by the law and evidence. [Citation.]" (*People v. Bell* (2009) 179 Cal.App.4th 428, 434.)

12

On appeal, we review the wording of a jury instruction de novo and determine whether the instructions are complete and correctly state the law. (*People v. Bell, supra*, 179 Cal.App.4th at p. 435.) We examine the entire charge of the court to determine whether the instructions are adequate, and whether it is reasonably likely that the instructions as a whole caused the jury to misapply the law. (*People v. Cain* (1995) 10 Cal.4th 1, 36.)

Defendant notes that section 220, by requiring an intent to do some further act or achieve an additional consequence, is a specific intent crime. (*People v. Rathert* (2000) 24 Cal.4th 200, 205 [defining specific intent]; *People v. Dixon* (1999) 75 Cal.App.4th 935, 942 [mens rea of section 220].) He further notes that in a prosecution for forcible sexual penetration (§ 289, subd. (a)(1)), the prosecution must prove the act was without the victim's consent, but it does not have to prove that the defendant intended to have sex against the victim's will. By contrast, an essential element of section 220 " 'is the intent to commit the act against the will of the complainant.' " (*People v. Davis* (1995) 10 Cal.4th 463, 509.) From this, defendant concludes the instruction on the section 220 offense was insufficient because the jury was not instructed that defendant had to intend to penetrate M.D. without her consent.

*People v. Dillon* (2009) 174 Cal.App.4th 1367 (*Dillon*) rejected a claim similar to that made here. The codefendant in *Dillon*, Hall, was convicted of assault with the intent to commit rape by a foreign object (*id.* at p. 1369) and claimed CALCRIM No. 890 was insufficient because it failed to specify that the prosecution had the burden of proving a lack of consent (*id.* at p. 1378). The *Dillon* court noted that section 220 required "not only the specific intent to commit the underlying sexual act, but a specific intent to commit that act without the consent of the victim. [Citations.]" (*Dillon*, at p. 1378.) CALCRIM No. 890 did not specifically address this element but "specified that a required element of the assault offense was that the defendant intended to commit the crime of penetration of the genital opening of another by a foreign object." (*Id.* at

13

p. 1379.)  As in this case, the instruction referred the jury to the instruction which defined that crime, CALCRIM No. 1045, which "in turn, specifies that the complainant's lack of consent is a necessary element of the crime of penetration of the genital opening of another by force.  A reasonable juror reviewing CALCRIM No. 1045, as instructed by CALCRIM No. 890, would conclude that unless he acted against the will or consent of the complainant, Hall could not have held the specific intent to commit the crime of penetration of the genital opening of another by force, and therefore could not be guilty of the lesser included assault offense as defined in CALCRIM No. 890." (*Ibid.*, fn. omitted.)

The defense in *Dillon* also argued that because CALCRIM No. 1045 does not define the intent requirement for forcible sexual penetration, "the jury would be unable to determine from looking at CALCRIM No. 1045 whether the defendant had the intent to commit that offense when he performed the act constituting the assault." (*Dillon, supra*, 174 Cal.App.4th at p. 1380.)  The *Dillon* court found that forcible sexual penetration was a general intent crime, the mental state for that crime was not the specific intent to commit it, and, relying on CALCRIM No. 1045, "jurors would reasonably conclude that if the prosecution failed to prove the complainant's lack of consent, the defendant could not be guilty of assault with intent to commit forcible sexual penetration." (*Ibid.*)

We begin our analysis of *Dillon* by noting one mistake in that decision, finding forcible sexual penetration is a general intent crime.  As a panel of this court has held, *Dillon* "construes the concept of 'specific intent' too narrowly." (*People v. Zarate-Castillo* (2016) 244 Cal.App.4th 1161, 1168.)  The crime of forcible sexual penetration requires an intent to gain sexual gratification or arousal or to inflict abuse, which makes it a specific intent crime. (*Ibid*.)

Although *Dillon* is wrong on this point, the mistake does not mean it reached the wrong result or that it cannot inform us here.  It correctly finds that CALCRIM Nos. 1045 and 890 must be read together, and that they require the jury to find a lack of consent

14

from the victim in order to convict a defendant under section 220. While *Dillon* did not address whether these instructions required the jury to find defendant also had an intent to commit the act without the victim's consent, it noted this was an element of the crime and found the two CALCRIM instructions appropriately instructed the jury on section 220. We take the next logical step and find these two instructions also require the jury to find defendant intended to commit the act without M.D.'s consent. CALCRIM No. 890 instructs the jury that one element of section 220 is that the defendant intended to commit sexual penetration by force, as defined in section 220. The jury was also instructed with CALCRIM No. 252 that forcible sexual penetration and any lesser included offense was a specific intent crime requiring a "specific intent and/or mental state" and that "[t]he act and the specific intent and/or mental state required are explained in the instruction or allegation." A reasonable juror therefore would understand that defendant could not be convicted under section 220 unless he specifically intended to commit the section 289 offense, as defined in CALCRIM No. 1045. Jurors would thus reasonably conclude that a conviction under section 220 required that it find defendant specifically intend to commit every element of section 289, which includes an intent that the victim did not consent to the act.[4]

C. *Unreasonable Belief, Intoxication, and Consent*

"Under *People v. Mayberry* (1975) 15 Cal.3d 143, a defendant who entertains both a reasonable and bona fide belief that the victim voluntarily consents to engage in the

---

[4] Defendant notes a federal district court granted habeas relief for Hall, the defendant in *Dillon*, finding that it was an unreasonable application of federal law (the due process right to be instructed on every element of an offense) to find the jury was adequately instructed on the element of intent to act without the complainant's consent. (*Hall v. Cullen* (N.D. Cal. July 29, 2010, No. C 09-5299 PJH) 2010 U.S. Dist. LEXIS, 89946 at *50.) We are not bound by decisions from the Ninth Circuit Court of Appeals, (*People v. Williams* (1997) 16 Cal.4th 153, 190), and even less so by an unpublished decision from a United States District Court, and, finally, we are also not persuaded by it.

15

sexual offense does not have the necessary wrongful intent to be convicted of the crime. [Citations.] The rationale is simple: one who labors under a mistake of fact that negates the existence of any criminal intent cannot be convicted of a crime. [Citations.]" (*People v. Castillo* (1987) 193 Cal.App.3d 119, 124.) The so-called *Mayberry* defense applies to section 220. (*People v. May* (1989) 213 Cal.App.3d 118, 128.)

Defendant contends the instruction on the consent defense was insufficient with regard to the section 220 charge. He first notes that the CALCRIM No. 890 instruction does not address the mistake of fact defense, and, while the incorporated CALCRIM No. 1045 instruction addresses mistake of fact, it does so under the auspices of *Mayberry*, which is limited to reasonable mistakes of fact. (See *People v. Williams* (1992) 4 Cal.4th 354, 360-361 [*Mayberry* defense limited to reasonable mistake that the complainant consented].) Asserting that an unreasonable mistake of fact defense applies to specific intent crimes, defendant finds the trial court's instructions were insufficient because it did not allow for unreasonable mistake of fact and by failing to inform the jury that voluntary intoxication could negate the specific intent required for section 220.

Defense counsel agreed with the trial court that a reasonable belief in consent instruction was not appropriate for the section 220 charge. This forfeits any claim that the trial court had a sua sponte duty to instruct on the mistake of fact defense to this charge. (See *People v. Wader* (1993) 5 Cal.4th 610, 657-658 ["When a defense attorney makes a 'conscious, deliberate tactical choice' to forego a particular instruction, the invited error doctrine bars an argument on appeal that the instruction was omitted in error"].)[5]

---

[5] This decision by counsel was reasonable, by making it potentially easier for the jury to find defendant guilty on the lesser included offense rather than the charged crime, and thereby making it feel less likely to confront an all or nothing choice of conviction on the charged offense or total acquittal. Here, counsel was presented with a complaining witness who reported the sexual assaults within a day of the attack, maintained an

Although counsel made no such choice regarding the defense of voluntary intoxication, which applies to specific intent crimes (*People v. Moore* (2018) 19 Cal.App.5th 889, 893-894; § 29.4), the trial court was not under a duty to instruct on this defense.

A defendant is entitled to an instruction on voluntary intoxication as a defense to a specific intent crime "only when there is substantial evidence of the defendant's voluntary intoxication and the intoxication affected the defendant's 'actual formation of specific intent.' [Citations.]" (*People v. Williams* (1997) 16 Cal.4th 635, 677.) While there was evidence M.D. was intoxicated, the evidence that defendant was intoxicated and that it affected his ability to form the required specific intent is minimal. Defendant did not testify, his one witness, Newland, who attended the party testified to M.D.'s drinking and defendant's, however he provided no evidence regarding defendant's alleged intoxication at any point near when the assault took place. The defense expert testified that alcohol can make the sleep disorder parasomnia, an unconsciousness defense, more likely, but gave no testimony regarding the effect of alcohol on forming intent. In light of the lack of evidence that defendant's intoxication affected his ability to form the necessary specific intent, there was no sua sponte duty to instruct on intoxication.

## II

### *Aggravated Kidnapping*

Defendant was convicted of kidnapping for extortion (§ 209, subd. (a)) under the theory that M.D. was kidnapped to extort a form of property from her, namely inducing

---

essentially consistent story that was backed by some forensic evidence, and a defendant who had a prior sexual assault conviction that was presented to the jury and who had tried to kidnap the complainant to induce her not to testify. The very favorable results achieved under these circumstances, acquittal on two of the three sex offense charges and a lesser included offense conviction on the third, is ample evidence of counsel's competent representation here.

17

her not to testify against defendant in the sexual assault prosecution.  Defendant contends he cannot be convicted under this theory.  We agree.

A.      *Theory of the Case and Motion to Acquit*

Defendant was charged in count six with aggravated kidnapping, section 209, subdivision (a) with the information stating in pertinent part:  "in that said defendant did unlawfully seize, confine, inveigle, entice, decoy, abduct, conceal, kidnap, and carry away [M.D.] with the intent to hold and detain, and who did hold and detain, the said [M.D.] for ransom, reward, extortion, money, and other valuable things, to wit, recanting statement to defense investigator Angela Santos and/or promise not to testify against Harpreet Singh in Sacramento Superior Court Docket 16FE018212."

The trial court said at the instructional conference that it would not instruct on simple kidnapping because it was not a lesser included offense of kidnapping for ransom or reward and was at most a lesser related offense here.  It issued a preliminary ruling denying a defense section 1118.1 motion to acquit on count six, finding extortion was a valid theory of liability, as M.D.'s recanting her statement that defendant assaulted her was a thing of value.  The prosecutor noted that the expanded definition of kidnapping, which included anything of value, took effect after the kidnapping, but that M.D.'s recantation and promise not to testify against defendant was a type of property covered under the definition of extortion in effect the time of the kidnapping.  Defense counsel maintained that extortion did not include anything of value, and that the acquittal motion should be granted "[b]ecause it's always been our position this is a simple kidnapping."  The trial court denied the motion, finding a jury could convict the defendant under an extortion theory.

The trial court instructed the jury that extortion was obtaining a person's property with the person's consent through the use of force or fear but did not define what constituted property.  It instructed the jury on false imprisonment (§ 237, subd. (a)) as a lesser included offense but did not instruct on simple kidnapping.

18

The prosecutor argued to the jury that M.D.'s right to come to court and testify was property for the purpose of extortion. In response, defense counsel conceded defendant was guilty of attempted to dissuade a witness but did not commit aggravated kidnapping.

*B.     Discussion*

1. *Insufficient Evidence of the Property Element*

Kidnapping for the purpose of extortion is a felony punishable by life in prison. (§ 209, subd. (a).)  When the crime was committed in October 2017, extortion was defined as "obtaining of property from another, with his consent, or the obtaining of an official act of a public officer, induced by a wrongful use of force or fear, or under color of official right."  (Former § 518, as amended by Stats. 1939, ch. 601, § 1.)[6]

Defendant contends the prosecution theory that M.D.'s right to testify is property for the purposes of kidnapping for extortion was wrong as a matter of law.  He contends the trial court's ruling that the prosecution could proceed under this theory erred as a matter of statutory interpretation and deprived him of his due process right to fair warning as to what the law prohibits or requires.

"The power to define crimes and fix penalties is vested in the Legislature. [Citations.]  Courts may not create a criminal offense by enlarging a statute or giving its terms false or unusual meanings.  Penal statutes may not be made to reach beyond their plain intent, covering only crimes coming clearly within the statutory language.  These laws must be construed according to the fair import of its terms.  [Citations.]"  (*People v. Kozlowski* (2002) 96 Cal.App.4th 853, 865 (*Kozlowski*).)

---

[6] The current definition of extortion went into effect on January 1, 2018, and reads in pertinent part:  "Extortion is the obtaining of property or other consideration from another, with his or her consent, or the obtaining of an official act of a public officer, induced by a wrongful use of force or fear, or under color of official right."  (§ 518, subd. (a); Stats. 2017, ch. 518, § 1.)

Section 7 defines property to include money, goods, chattels, things in action and evidences of debt (§ 7, subds. (10), (12)) but the definition of property is not limited to the items listed in section 7. (*People v. Leyvas* (1946) 73 Cal.App.2d 863, 865.) *Kozlowski* addressed whether a bank card personal identification number (PIN) code was property for the purposes of the extortion statute. (*Kozlowski, supra*, 96 Cal.App.4th at pp. 856, 866.) Although the Court of Appeal found that a PIN was property under the extortion statute (*id*. at p. 856), *Kozlowski* illustrated the limits of what is property, and we find that testifying as a complaining witness is beyond that limit.

*Kozlowski* began by noting that property and larceny cases were relevant to defining property because those offenses were related to the crime of extortion; at times courts found it difficult to distinguish between them. (*Kozlowski, supra*, 96 Cal.App.4th at p. 866; see *People v. Torres* (1995) 33 Cal.App.4th 37, 50; *People v. Hesslink* (1985) 167 Cal.App.3d 781, 790.) Theft cases define property "as the exclusive right to use or possess a thing or the exclusive ownership of a thing. [Citations.]" (*Kozlowski*, at p. 866.) The term "property" was "all-embracing, including every intangible benefit and prerogative susceptible of possession or disposition. [Citation.] The right to own property implies the right to possess or use a thing to the exclusion of others. [Citation.]" (*Ibid*.)

The Court of Appeal took judicial notice that a PIN code was more valuable if kept exclusive. (*Kozlowski, supra*, 96 Cal.App.4th at p. 867.) Accordingly, "it may reasonably be said that a PIN code is property because it implies the right to use that access code—and to access the funds in the related bank account by means of that code. [Citation.] Operating as it does as a means of account access, a PIN code can be characterized as intangible property. [Citation.]" (*Ibid.*) This conclusion was reinforced by a case finding making a copy of a house key was theft because it deprived the owner of the exclusive use of the key to enter the house. (*Id.* at pp. 867-869.)

20

" ' An essential element of individual property is the legal right to exclude others from enjoying it.  If the property is private, the right of exclusion may be absolute; if the property is affected with a public interest, the right of exclusion is qualified.' " (*Desny v. Wilder* (1956) 46 Cal.2d 715, 731, quoting *International News Service v. Associated Press* (1918) 248 U.S. 215, 250 [63 L.Ed. 211, 225] (Brandeis, J. dissenting).)

Whether to testify is not within the control of a crime victim or alleged crime victim.  Enforcing the state's laws is the prerogative of the Attorney General.  (Cal. Const., art. V, § 13)  "The district attorney is the public prosecutor, except as otherwise provided by law.  The public prosecutor shall attend the courts, and within his or her discretion shall initiate and conduct on behalf of the people all prosecutions for public offenses." (Gov. Code, § 26500.)  Thus, the prosecutor has sole discretion on who to charge, what charges to pursue, and what punishment to seek.  (*People v. Sidener* (1962) 58 Cal.2d 645, 650, disapproved on other grounds in *People v. Tenorio* (1970) 3 Cal.3d 89, 91.)  "No private citizen, however personally aggrieved, may institute criminal proceedings independently [citation], and the prosecutor's own discretion is not subject to judicial control at the behest of persons other than the accused.  [Citations.]" (*Dix v. Superior Court* (1991) 53 Cal.3d 442, 451.)

The prosecutor's power extends to the conduct of criminal trials.  "Exclusive prosecutorial discretion must also extend to the conduct of a criminal action once commenced.  'In conducting a trial, a prosecutor is bound only by the general rules of law and professional ethics that bind all counsel.' [Citation.]  The prosecutor has the responsibility to decide in the public interest whether to seek, oppose, accept, or challenge judicial actions and rulings.  These decisions, too, go beyond safety and redress for an individual victim; they involve 'the complex considerations necessary for the effective and efficient administration of law enforcement.'  There is no place in this scheme for intervention by a victim pursuing personal concerns about the case." (*Dix v. Superior Court, supra*, 53 Cal.3d at p. 452.)

21

In the context of a criminal prosecution, M.D.'s decision to accuse defendant of the sexual assaults and her ability to testify against him in a criminal trial has no value unless the prosecutor decides to file charges against defendant and, subject to the rules of evidence as determined by the trial court, call her as a witness. Since the complaint and testimony are subject to the discretion of another, it is not in M.D.'s exclusive dominion and control and accordingly is not property in the context of the extortion statute. The only theory of guilt for the section 209 charge was kidnapping through extortion and the only evidence of the property element of extortion was M.D.'s testifying against defendant; since there is no proof as to an element of the offense, we conclude there is insufficient evidence to support the section 209 conviction.

2. *Lesser Included Offense*

An appellate court has the power to modify a conviction to a lesser included offense if there is insufficient evidence of the greater but sufficient evidence to support conviction on the lesser offense. (*People v. Navarro* (2007) 40 Cal.4th 668, 677.)

"The test for determining whether there is a necessarily included offense is whether one offense cannot be committed without necessarily committing another offense; the latter is a necessarily included offense. [Citation.] 'An offense is necessarily included in the charged offense if (1) under the statutory definition of the charged offense the charged offense cannot be committed without committing the lesser offense, or (2) the charging allegations of the accusatory pleading include language describing the offense in such a way that if the charged offense was committed as specified, the lesser offense was necessarily committed.' [Citations.]" (*People v. Cortez* (2018) 24 Cal.App.5th 807, 816-817.)

22

Simple kidnapping (§ 207)[7] is not a lesser included offense of the crime here, section 209, subdivision (a) under the statutory definition test "since the latter can be accomplished without asportation and the former cannot." (*People v. Greenberger* (1997) 58 Cal.App.4th 298, 368, fn. 56.) Whether a crime is a lesser included offense under the accusatory pleading test is determined by examining both the pleading and the evidence adduced at the preliminary hearing. (See *People v. Ortega* (2015) 240 Cal.App.4th 956, 967 ["The evidence adduced at the preliminary hearing must be considered in applying the accusatory pleading test when the specific conduct supporting a holding order establishes that the charged offense necessarily encompasses a lesser offense"].)

The asportation required for simple kidnapping is moving the victim must be "substantial in character," rather than slight or trivial. (*People v. Stanworth* (1974) 11 Cal.3d 588, 601.) In making that determination, the trier of fact may consider factors other than the distance moved. (*People v. Martinez* (1999) 20 Cal.4th 225, 235, disapproved on other grounds in *People v. Fontenot* (2019) 8 Cal.5th 57, 70.) This includes "some consideration of the 'scope and nature' of the movement or changed environment, and any increased risk of harm." (*Martinez,* at p. 236.)

The information alleged that, with respect to the conspiracy to dissuade a witness (M.D.) charge in count four, one of the overt acts was "that they forced her into a car at gunpoint, covered her head with a ski mask, and threaten to harm her and rape her person if she did not provide a re-canting statement to defense investigator Angela Santos regarding the rape described in Sacramento Superior Court Docket 16FE018212." The

---

[7] Section 207, subdivision (a) defines simple kidnapping as: "Every person who forcibly, or by any other means of instilling fear, steals or takes, or holds, detains, or arrests any person in this state, and carries the person into another country, state, or county, or into another part of the same county, is guilty of kidnapping."

evidence adduced at the preliminary hearing showed M.D. was walking across the street towards her apartment when she was forced into the car and driven 30 to 45 minutes before she was released. This was ample asportation for the purpose of simple kidnapping. It was therefore a lesser included offense of the section 209 charge under the accusatory pleading test. Since sufficient evidence supports simple kidnapping, we shall modify defendant's conviction to that crime.[8]

## DISPOSITION

The conviction for kidnapping for extortion in count six is modified to simple kidnapping (§ 207, subd. (a)) and the matter is remanded for resentencing. In all other respects, the judgment is affirmed.

_____/s/_____,
BLEASE, J.

We concur:

_____/s/_____,
RAYE, P. J.

_____/s/_____,
HOCH, J.

---

[8] Our resolution of this contention makes it unnecessary for us to determine defendant's remaining contentions regarding the trial court's duty to instruct on simple kidnapping as a lesser included offense or to instruct on the definition of property in the context of kidnapping for extortion.